GARY R. FRINK AND SHERRY R. FRINK, et al. [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Frink v. Commissioner
Docket Nos. 12544-80, 14917-81, 17023-81, 26983-82, 26984-82, 26985-82, 26986-82, 26987-82, 26988-82, 26989-82, 26990-82, 26991-82, 26992-82, 26993-82, 26994-82, 27128-82, 27291-82, 27292-82, 4048-83, 7720-83.
United States Tax Court
T.C. Memo 1984-669; 1984 Tax Ct. Memo LEXIS 4; 49 T.C.M. (CCH) 386; T.C.M. (RIA) 84669; December 27, 1984. *4 D. Irvin Couvillion, for the petitioners. Kathleen O. Lier,A. Albert Ajubita, for the respondent. KORNER MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies and additions to tax against petitioners in these cases as follows: [2] *5 Tax year
Petitioners
Docket No.
ended
Deficiency
Gary R. Frink
12544-80
12/31/75
$10,253.00
Sherry R. Frink
12/31/76
6,203.00
James M. George
14917-81
12/31/75
15,285.90
Margaret C. George
12/31/76
[3] 18,621.70
12/031/77
5,131.77
Gary R. Frink
17023-81
12/31/77
2,400.85
Sherry R. Frink
Hollis O. Graham
26983-82
12/31/75
26,405.00
Ida G. Graham
12/31/76
13,972.00
George A. Wolcott
26984-82
12/31/75
11,404.65
Dorothy Wolcott
12/31/76
6,484.33
12/31/77
3,935.53
Tuncay Ertan
26985-82
12/31/75
13,869.00
Nona G. Ertan
12/31/76
6,920.00
12/31/77
2,943.00
Caroline Norton,
26986-82
of Coman S. Norton[4]
12/31/76
15,040.17
Executrix, Estate of
12/31/77
2,914.00
Roland M. Toups
26987-82
13/31/75
25,605.00
Kathryn B. Toups
12/31/76
43,014.00
David R. Carpenter
26988-82
13/31/77
21,447.00
Erica J. Carpenter
Charles A. Prince
26989-82
13/31/76
755.60
Ruth O. Prince
Harry R. Layne
26990-82
12/31/75
22,901.00
Janet J. Layne
12/31/76
1,411.00
12/31/77
1,252.00
Stephen G. Abshire
26991-82
12/31/75
19,681.00
Mary B. Abshire
12/31/76
11,543.00
12/31/77
2,472.00
Janet F. Baum
26992-82
12/31/76
15,040.17
12/31/77
2,914.00
Kenneth G. Fink, Jr.
26993-82
12/31/77
62,804.00
Carol Fink
Donald L. McCollister
26994-82
12/31/77
10,085.00
Sandra M. McCollister
Robert A. Rayford
27128-82
12/31/75
30,029.40
Iris B. Rayford
12/31/76
13,225.61
12/31/77
11,502.20
12/31/78
[5] 7,271.00
Frem F. Boustany, Sr.
27291-82
12/31/75
34,596.40
Beatrice J. Boustany
12/31/76
47,530.52
12/31/77
65,870.90
Frem F. Boustany, Jr.
27292-82
12/31/76
31,687.00
Angell F. Boustany
12/31/77
31,658.00
Sidney Frederick
4048-83
12/31/76
31,195.21
Irene S. Frederick
12/31/77
12,213.90
Roland M. Toups
7720-83
12/31/77
39,265.00
Kathryn B. Toups By amended answers, respondent asserted additional deficiencies, resulting in the following increased deficiencies in three of the foregoing cases: [6]
Tax Year
Petitioners
Docket No.
ended
Increased deficiency
David R. Carpenter
26988-82
12/31/77
$23,727.00
Erica J. Carpenter
Kenneth G. Fink, Jr.
26993-82
12/31/77
69,239.00
Carol Fink
Donald L. McCollister
26994-82
12/31/77
11,165.00
Sandra M. McCollister
After concessions, the issues remaining for our decision are: (1) *6 Whether losses generated by the construction and operation of the Biloxi Hilton Hotel project are attributable to two corporations, styled Argo Hotels, Inc. and Coastal Golf, Inc., which held legal title thereto, or to the individual petitioners herein, as partners in commendam [7] in Biloxi Hotel Properties Partnership; and (2) whether the allocations of losses provided for in the written agreement of such partnership, as amended, possessed substantial economic effect in 1977 as to the three petitioners who entered the partnership as partners in commendam on December 16, 1977. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, who resided in the following locations at the times they filed their petitions herein, filed their Federal income tax returns for the years in issue with the following Internal Revenue Service Centers: Returns
Service
Petitioners
Residence
Year
Date filed
center
Gary R. Frink
Luray,
1975
4/15/76
Cincinnati,
Virginia
1976
4/15/77
Ohio
Sherry R. Frink
Annapolis,
1977
4/15/78
Maryland
James M. George
Lumberton,
1975
4/15/76
Atlanta,
Margaret C. George
Mississippi
1976
4/15/77
Georgia
1977
4/15/78
Hollis O. Graham
Ruston,
1975
4/15/76
Austin,
Ida G. Graham
Louisiana
1976
4/15/77
Texas
George R. Wolcott
Houston,
1975
4/15/76
Austin,
Dorothy Wolcott
Texas
1976
4/15/77
Texas
1977
4/15/78
Tuncay Ertan
Alexandria,
1975
4/15/76
Austin,
Nona G. Ertan
Louisiana
1976
4/15/77
Texas
1977
4/15/78
Caroline Norton,
Baton Rouge,
1976
4/15/77
Austin,
Executrix, Estate
Louisiana
1977
4/15/78
Texas
of Coman S. Norton Roland M. Toups
Baton Rouge,
1975
4/15/76
Austin,
Kathryn B. Toups
Louisiana
1976
4/15/77
Texas
1977
4/15/78
David R. Carpenter
Baton Rouge,
1977
4/15/78
Austin,
Erica J. Carpenter
Louisiana
Texas
Charles A. Prince
Alexandria,
1976
4/15/77
Austin,
Ruth O. Prince
Louisiana
Texas
Harry R. Layne
Mandeville,
1975
4/15/76
Austin,
Janet J. Layne
Louisiana
1976
4/15/77
Texas
1977
4/15/78
Stephen G. Abshire
Lafayette,
1975
4/15/76
Austin,
Mary B. Abshire
Louisiana
1976
4/15/77
Texas
1977
4/15/78
Janet F. Baum
Baton Rouge,
1976
4/15/77
Austin,
Louisiana
1977
4/15/78
Texas
Kenneth G. Fink, Jr.
Deham Springs,
1977
4/15/78
Austin,
Carol Fink
Louisiana
Texas
Donald L. McCollister
Baton Rouge,
1977
4/15/78
Austin,
Sandra M. McCollister
Louisiana
Texas
Robert A. Rayford
Alexandria,
1975
4/15/76
Austin,
Iris B. Rayford
Louisiana
1976
4/15/77
Texas
1977
4/15/78
Frem F. Boustany, Sr.
Lafayette,
1975
4/15/76
Austin,
Beatrice J. Boustany
Louisiana
1976
4/15/77
Texas
1977
4/15/78
Frem F. Boustany, Jr.
Crowley,
1976
4/15/77
Austin,
Angell F. Boustany
Louisiana
1977
4/15/78
Texas
Sidney Frederick
Lafayette,
1976
4/15/77
Austin,
Irene S. Frederick
Louisiana
1977
4/15/78
Texas
*7 In 1972, John C. Yemelos (hereinafter "Yemelos") and his mother-in-law, Phopho Cosmas (hereinafter "Cosmas"), formed a partnership or joint venture known as Casren Development Company (hereinafter "Casren"). Yemelos owned 80 percent of Casren, and Cosmas owned the remaining 20 percent. In that same year, Casren undertook the project of developing the Biloxi Hilton Hotel, a commercial resort and convention-oriented hotel to be constructed in Biloxi, Mississippi. By warranty deed dated November 6, 1972, acting on behalf of Casren, Yemelos acquired title in his own name to 7.5 acres of land located in Biloxi, Mississippi (hereinafter "hotel site"). In December of 1972, Yemelos applied to Hilton Inns, Inc. for a license or franchise to operate a Hilton hotel, relative to which a fee of $20,000 was paid.On August 20, 1973, Hilton Inns, Inc. issued a license or franchise to operate a Hilton Hotel for a period of 20 years to Yemco, Inc. (hereinafter "Yemco"), which was a corporation whose sole shareholders were Yemelos and Cosmas. By deeds both dated September 24, 1973, again acting on behalf of Casren, Yemelos purchased in his own name two additional strips of land adjoining the hotel *8 site. These parcels, known as Vapors Club and Stag Club, were purchased for a total consideration of $376,566.99. On October 2, 1975, acting on behalf of Casren, Yemelos purchased an additional five acres of land from the Small Business Administration (hereinafter "S.B.A. parcel") for a total consideration of $210,000. Title to the S.B.A. parcel remained in Yemelos' name until July 29, 1977, at which time it was transferred by warranty deed to an entity known as Biloxi Hotel Properties Partnership. Seeking construction financing for the hotel project, Yemelos was referred in 1973 to a real estate investment trust located in the Washington, D.C. area, known as Mortgage Investors of Washington (hereinafter "MIW"). On April 17, 1973, MIW executed a Mortgage Loan Commitment in favor of Yemco, wherein it committed to loan $6,700,000 for the construction of a sevenstory, convention-oriented hotel on the hotel site in Biloxi, Mississippi. The loan commitment called for an interest rate of 4 1/2 percentage points in excess of the prime interest rate of Chemical Bank of New York, to be adjusted monthly. The commitment further provided that Yemelos and his wife were to supply MIW with an *9 irrevocable letter of credit in its favor from Colonial Bank of New Orleans (hereinafter "Colonial") in the amount of $500,000. Both Yemelos and MIW were aware that the interest to be charged by MIW for construction of the hotel would be usurious under Mississippi law if made to an individual or a partnership. [8]
In negotiations concerning the construction financing, MIW was represented by Charles R. Galloway (hereinafter "Galloway"), an attorney whose practice was located in Gulfport, Mississippi. Galloway's services were engaged through Henry Sarpy of New Orleans, Louisiana, another attorney who represented MIW on occasion. When Yemelos and his accountant, Ronald F. Gregory, first met with Galloway concerning the construction loan, they discussed the foregoing usury problem under Mississippi law. To avoid this problem, Yemelos and Gregory indicated that they wished to use a so-called "conduit corporation" to borrow the funds from MIW. Galloway understood that this term *10 meant a corporation which would hold legal title to property as an agent for the holder of equitable title, in order to facilitate financing arrangements with respect to such property. Also during 1973, Yemelos was involved in the formation of a new corporation, known as Argo Hotels, Inc. (hereinafter "Argo"). On April 12, 1973, Argo was incorporated by Yemelos under the laws of the State of Louisiana.Argo was formed, as stated in its Articles of Incorporation, for the following purposes: To hold title to real estate, to borrow money and make loans on said real estate for the account of and for the beneficial interest of its stockholders and to take such other action in connection with such real estate as may be required of it by the beneficial owner or owners thereof, and to engage in any other lawful activity for which corporations may be formed under the Louisiana Business Corporation Law. Yemelos and his wife, Despina Cosmas Yemelos, were the sole officers, directors and shareholders of Argo, but they paid no consideration for their stock. Yemelos and Gregory suggested to Galloway that Argo could be used as a "conduit" for the purpose of avoiding local usury restrictions. Galloway *11 responded that he already owned a conduit corporation, styled "C. M. Conduit" (hereinafter "Conduit"), which he had used to avoid similar problems in the past, and which could be used in this instance.Galloway preferred to use Conduit for this purpose since he believed that it was important to separate the legal and equitable ownership of the property, an objective which he felt would not be served by use of Yemelos' corporation, Argo. Galloway, who was the sole shareholder and, together with his children, was a director of Conduit, described the purpose of the corporation as follows: [T]o have a corporate body, having a real business purpose, for use by persons who needed to borrow money, and for one reason or other, frequently because of the interest rate, found it necessary to make the loan through a corporation rather than through an individual. For its services, Conduit typically charged a fee of $1,000, although that sum would vary depending upon the size of the loan, the time periods involved, and the risks assumed by the corporation. In this instance, Galloway advised, Conduit's fee would be $1,000. Several weeks following his meeting with Galloway, Yemelos accepted the *12 recommendation to use Conduit, in connection with the MIW financing, pursuant to the foregoing terms. In accordance with this decision, Galloway prepared a set of specimen documents and sent them to Henry Sarpy in New Orleans with a request that they be submitted to MIW for its approval. After a period of several weeks, Galloway was advised that MIW had rejected the use of Conduit, at least in part because it did not approve of the word "conduit" in the corporate name. Since it was the only other option then under consideration, and in view of the shortness of time before the scheduled closing, Galloway and Yemelos decided that Argo should receive legal title to the subject property. On October 5, 1973, Yemelos and Argo entered into a trust agreement, pursuant to which it was agreed, inter alia, that: (1) Argo would act as Yemelos' agent in securing the MIW loan on his behalf; (2) Yemelos would indemnify Argo against all claims arising under the agreement; (3) Yemelos would fund all disbursements incident to the loan; (4) Yemelos would personally guarantee the loan; and (5) Argo would "transact no business whatsoever for its own account as long as record title to this property and *13 construction project remain in its name." Argo qualified to do business in the State of Mississippi on October 8, 1973. On the application to so qualify Argo, Yemelos described the purposes of the corporation as follows: to hold title to real estate, to borrow money and to make loans on said real estate and to take such other action with such real estate as may be required of it by the beneficial owner or owners thereof. [Emphasis added.] In connection with MIW's loan in the amount of $6,700,000, which was supplemented in May of 1974, and again in May of 1975, in the respective amounts of $500,000 and $800,000, for a total loan of $8,000,000, the following pertinent documents were executed on the dates shown: (1) October 10, 1973 - a warranty deed, whereby Yemelos conveyed to Argo title to the hotel site for the sum of $100; (2) October 10, 1973 - a conditional assignment of the Hilton license or franchise by Yemco to MIW, as partial security for the construction financing; (3) October 10, 1973; May 17, 1974; May 12, 1975 - notes and deeds of trust, executed by Argo in favor of MIW in the respective amounts of $6,700,000, $500,000 and $800,000; (4) October 10, 1973; May 17, 1974; *14 May 12, 1975 - building loan agreements, wherein Argo and MIW agreed to certain advances for certain stages of construction; (5) October 10, 1973; May 17, 1974; May 12, 1975 - continuing construction loan guarantees, wherein Yemelos and his wife personally guaranteed MIW's loans to Argo; and (6) October 10, 1973; May 17, 1974 [9] - affidavits executed by Yemelos and his wife for the purpose of inducing MIW to lend Argo the subject construction funds. None of the foregoing notes, deeds of trust, building loan agreements or continuing construction loan guarantees describe Argo as an "agent," "nominee" or "conduit" corporation. Each of the foregoing affidavits provides that Argo is the "owner" of the hotel site. It was Galloway's understanding, however, that the term "owner," as used in this context, related to legal ownership and not to equitable or beneficial ownership of the property. On October 10, 1973, Argo also entered into building contracts with two separate building companies for construction of a portion of the hotel project, in each of *15 which Argo was described as "owner." Yemelos owned 50 percent of each such building company. On October 9, 1973, pursuant to the terms of MIW's initial loan commitment, Colonial issued an irrevocable letter of credit in favor of MIW for the account of Argo for a sum not to exceed $500,000. As security therefor, on October 10, 1973, Argo executed a deed of trust in favor of Colonial in the amount of $550,000. This deed of trust was subordinate to the deed of trust in favor of MIW. One Edward J. DeMartini was an attorney in Louisiana who represented Colonial as well as Argo, and who was additionally a director of Colonial. DeMartini and Galloway in early October of 1973, and Galloway again in May of 1974, advised MIW in writing that its documentation for the loan to Argo would establish "valid and binding obligations of the persons or entities purporting to be bound thereby * * *." At such times, however, DeMartini and Galloway, as well as Colonial, believed that Argo held solely legal title to the hotel properties, and that it held such title as agent for Yemelos. At all times here pertinent, it was similarly the understanding of Peyton Fletcher III, the president of MIW, that Yemelos *16 was the real borrower with whom MIW was dealing, and that the construction loan was being made to a "nominee" corporate entity solely because of Mississippi usury laws. During construction of the hotel, most draws from MIW were paid to Galloway and deposited by him into a trust account which he maintained. Funds were then disbursed from such account directly to each contractor or suspplier upon verification that the services or materials had been provided. Some checks for construction work were made payable to Argo, but these checks were deposited in Casren's bank account. On June 10, 1974, Omicron Corporation (hereinafter "Omicron") was formed under the laws of the State of Mississippi by Yemelos, his wife and Cosmas. Yemelos was the sole shareholder of Omicron. Omicron performed all management services for the Biloxi Hilton Hotel, receiving a fee in the amount of two percent of the gross revenues collected by it. In April of 1975, the Biloxi Hilton Hotel project was completed and placed in service. On August 1, 1975, Coastal Golf, Inc. (hereinafter "CG") was formed under the laws of the State of Mississippi by Galloway and one Robert C. Galloway, for the following purposes: To *17 acquire and operate golf courses, tennis courts, amusement parks and other properties providing private and public entertainment, and generally to engage in the business of owning and operating places of amusement, entertainment and recreation. Yemelos was CG's president, and Yemelos and his wife were its sole shareholders and, together with Galloway, directors. On August 19, 1975, CG purchased from Bankers Trust Savings and Loan Association (hereinafter "Bankers Trust") for the sum of $1,045,000, an established golf course, known as the Edgewater Golf Course (hereinafter "golf course"), which was situated near the Biloxi hotel project. It was intended that the golf course would be maintained as part of the hotel facility. Acting as CG's president, Yemelos executed a note for the full amount of the purchase price, of which he also personally guaranteed repayment of $100,000. In neither the note nor the guarantee is CG described as an "agent," "nominee" or "conduit" corporation. In structuring the sale of the golf course it was Yemelos' wish to limit his personal liability to $100,000, a wish to which the bank acceded because it had previously foreclosed on the golf course and was *18 anxious to sell it. While Yemelos' interests might have been met by his execution of a partial recourse note in favor of Bankers Trust, it was apparently the bank's interest to carry a recourse indebtedness in the full amount of the note as a current asset on its financial statements, and this interest could not be met through such a partial recourse financing arrangement. It was accordingly decided by both parties that title to the golf course would be held by CG, that Bankers Trust would make its recourse loan to the corporation, and that such loan would be guaranteed by Yemelos to the limited extent of $100,000. Unlike the construction financing provided by MIW, there was no usury problem under Mississippi law associated with Bankers Trust's loan for acquisition of the golf course. As a result of cost overruns during construction of the hotel and excessive losses during its start-up period, in late 1975, Yemelos contacted Robert G. Jackson, an attorney who was involved in real estate syndications, concerning the possibility of admitting new investors into Casren. Jackson was aware that the hotel site and golf course were titled in the names of Argo and CG, but he also believed *19 that those corporations held title as "nominees," and that it was Casren which really owned the project. Jackson and Yemelos held a number of meetings to discuss the capital contributions which would be made by investors, their return on capital, the equity Yemelos was to retain as general partner, and the fee Yemelos would receive. Such discussions took account of the combined investments of Yemelos and Cosmas in the project, the risks assumed by Yemelos, which were greater than those assumed by general partners in other syndications handled by Jackson, and the services provided for the project by Yemelos and the corporations which he controlled. Initially, Yemelos sought an equity interest in the partnership of over 60 percent plus a six percent management fee for Omicron. It was the equity interest which was most important to him, however, and it was ultimately decided that he would receive an approximate equity interest of 65 percent, but the management fee of only two percent for Omicron would be maintained. On December 1, 1975, a private placement memorandum was issued, soliciting investors in the partnership. The memorandum recited, inter alia, that the partnership would *20 own and operate the project, but that legal title to the hotel and golf course would be held by two nominee corporations, Argo and CG, for the equitable and beneficial interest of the partnership. On December 30, 1975, Casren applied for authority to sell limited partnership interests in Mississippi, and the application was granted on the next day. The interests were to be sold through the conversion of Casren under Louisiana law to a partnership in commendam, to be known as the Biloxi Hotel Properties Partnership (hereinafter "BHPP"). On December 31, 1975, articles of partnership in commendam for BHPP were executed, but for undisclosed reasons they were not registered with the State of Louisiana until September 17, 1981. On December 31, 1975, two so-called "nominee agreements" were executed. In one such agreement, reciting that certain real estate and improvements for the hotel project had been "placed in the record name" of Argo by Yemelos in October 1973, it was agreed by Argo and BHPP that: (1) Argo would act only for the account of BHPP; (2) BHPP would indemnify Argo against any loss or liability arising through its actions; (3) Argo held title solely as nominee for BHPP; *21 and (4) title to the real estate comprising the hotel project "is for the equitable, legal and beneficial ownership of [Casren] * * * which * * * has since been converted into [BHPP]." In the second nominee agreement, which was between CG and BHPP, it was declared in similar terms that CG held title to certain real estate and improvements for the hotel project solely as nominee for BHPP. Neither of these agreements were publicly recorded in Louisiana or Mississippi. Also on December 31, 1975, the following documents were executed relative to the hotel project properties: (1) A warranty deed, by which Yemelos conveyed the Vapors Club and Stag Club parcels to BHPP; and (2) a document executed by Yemelos and his wife, in their capacities as individuals and not as partners, purporting to convey to BHPP, all of their beneficial interests in any properties held by Argo and CG, and declaring that BHPP was the legal and equitable owner of such properties. Pursuant to BHPP's articles of partnership, Yemelos and Cosmas were named as general partners, and they owned 68.9 percent and 5.3 percent partnership interests, respectively. The remaining 25.8 percent ownership interest was divided among *22 the partners in commendam, included among whom were twelve of the petitioners in this case. The partners in commendam admitted on December 31, 1975, contributed cash and notes in the total amount of $2,317,700 for their foregoing interest. Yemelos and Cosmas contributed the balances in their capital accounts in Casren in the respective amounts of $142,600 and $450,000. As a result of continued financial problems, on November 9, 1976, BHPP's articles were amended to provide for the addition of new partners in commendam.Under the amended articles, the interests of Yemelos and Cosmas were reduced to approximately 61.76 percent and 5 percent, respectively. The remaining 33.24 percent interest was divided between the existing partners in commendam, who now owned a collective interest of approximately 23.24 percent, and the new partners in commendam, who contributed a total of $1,042,650 for a collective interest of 10 percent, and included among whom were an additional two of the petitioners herein. At the request of BHPP, on December 27, 1976, CG conveyed title to the gold course to Argo. In consideration of Argo's grant of a lien on the golf course to MIW (which lien was to be subordinate *23 to that of Bankers Trust), and of BHPP's agreement to expressly assume joint and several liability with Argo relative to its $8,000,000 indebtedness to MIW, tha latter on the same date agreed to limit the extent to which it might have recourse to the partners of BHPP in any action to enforce such indebtedness. Also on December 27, 1976, MIW agreed to modify the continuing loan guaranty provided by Yemelos and his wife on May 17, 1974, so as to limit their liability tod the approximate sum of $3,950,000. In the documentation executed relative to the foregoing agreements to which MIW was a party, the declaration was made repeatedly that Argo held title to the subject properties for the benefit of BHPP. On December 16, 1977, as a result of continued operating losses, BHPP's articles were once again amended to provide for tha addition of new partners in commendam. Under the amended articles, the interests of Yemelos and Cosmas were reduced to approximately 53.94 percent and 4.35 percent, respectively. The remaining 41.71 percent interest was divided between the new and existing partners in commendam, six of whom were so-called "newly admitted" partners, and included among whom were *24 an additional three of the petitioners herein. These latter three newly admitted partners in commendam, petitioners Carpenter, Fink and McCollister, acquired partnership interests of .5, 1.488 and .3 percentages, respectively, in return for contributions of $50,000, $148,800 and $300,000, respectively. Together, the six newly admitted partners acquired a partnership interest of 5.888 percent. At the end of 1977, petitioners carpenter, Fink and McCollister registered positive capital account balances in BHPP, in the respective amounts of $978, $2,910, and $587. Under the second amended articles, for all years following 1980, all items of partnership income, gain, loss, deduction or credit were generally to be allocated to the partners in proportion to their ownership interests. For 1977 through 1980, however, such items would be allocated among the partners in certain prescribed percentages, with 97.2 percent of such items allocated to the six "newly admitted" partners for the period December 16, 1977 through December 31, 1977. In the event of the liquidation or termination of BHPP, any partner in commendam having a deficit balance in his capital account would not be required to *25 contribute to the partnership or to its creditors the amount of such deficit balance, nor would any such partner receive a proportionately smaller share of partnership assets under the foregoing partnership agreements. Pursuant to the second amendment to the partnership agreement, upon a sale of all or part of BHPP's property, the proceeds would be distributed, in the sole discretion of the general partners, to certain preferred groups, and then in the following percentages to the generic groupings of partners in commendam described: Partners in commendam
Allocable percentage
Existing
52.148
Additional
26.048
Increasing
7.094
Newly admitted
14.710
Within the foregoing groupings, the proceeds were required to be distributed in proportion to each partner's ownership of "partnership stock," as defined in the agreement. The percentage ownership interests of those partners in commendam in BHPP who are petitioners herein, were as follows as of the date of each of the foregoing amendments to its partnership articles: Petitioner
Percentage interest
12/31/75
11/9/76
12/16/77
James M. George
.60
[10] *26 Coman S. Norton
.30
Roland M. Toups
.60
1.60
1.9255
Hollis O. Graham
.60
Gary R. Frink
.30
Harry R. Layne
.60
Frem F. Boustany, Sr.
.60
1.60
2.251
[11] George A. Wolcott .30
Robert A. Rayford
.60
Stephen G. Abshire
.45
Charles A. Prince
.30
Tuncay Ertan
.30
Frem F. Boustany, Jr.
1
1.3255
Sidney Frederick
1
Donald L. McCollister
.3 David R. Carpenter
.5 Kenneth G. Fink
1.488
All of the partners' capital contributions to BHPP were deposited into bank accounts maintained either by Omicron, doing business as the Biloxi Hilton, or by BHPP. To the extent that portions of the capital contributions made by certain partners were in the form of promissory notes in favor of BHPP, such notes were always made payable to BHPP. At all times here pertinent, Argo was a viable and active corporation which performed business activities including holding title to real estate, executing mortgages and deeds of trust, negotiating loans, entering into contracts, including a nominee agreement with BHPP, acquiring personal property, subjecting itself to third-party claims during construction, receiving income, incurring expenses, and filing Federal and state income tax returns. Similarly, CG was a viable and active corporation which performed business activities essentially comparable to those performed by Argo. No bank accounts were ever opened in the names of Argo or CG. No capital was ever contributed to either corporation, *27 and neither corporation had any employees. On July 29, 1977, the hotel site, golf course and other properties were transferred to BHPP, at its request, as follows: Transferor
Property
(1) Argo
Hotel property and golf course
(2) Argo and CG
Golf course personal property
(3) Omicron, CG and Yemco
All hotel personal property
(4) Yemelos, individually
S.B.A. parcel
Also in July of 1977, permanent financing for the hotel was closed with Equitable Life Assurance Society of the United States. On March 7, 1980, a fee of $100 was paid to Argo, and reported by it on its 1980 Federal income tax return. A fee of $100 was paid to CG on the same date, and reported by it on its 1980 Federal income tax return. On its returns for 1975, 1976 and 1977, BHPP claimed the following losses attributable to the construction and operation of the Biloxi Hilton Hotel project: Period
Net loss
12/31/75
$684,999.00
1/1/76 - 10/31/76
969,358.94
11/1/76 - 12/31/76
598,594.00
1/1/77 - 7/28/77
575,447.00
7/29/77 - 12/15/77
704.741.00
12/16/77 - 12/31/77
593,913,00
Total
$4,127,052.94
Corporate income tax returns were filed in the name of Argo for each of those same years, and in the name of CG for 1976 and 1977, reflecting neither income, *28 deductions nor tax liability, and reciting that each corporation was a nominee which transacted no business for its own account. No Federal income tax return was filed by CG for 1975. On their individual returns, petitioners deducted their distributive shares of the losses reported by BHPP for the foregoing years. In his notices of deficiency, respondent disallowed those deductions, determining that the losses were properly attributable to the corporate entities, Argo and CG, rather than to the partnership. ULTIMATE FINDINGS OF FACT (1) From October 10, 1973, through July 29, 1977, Argo served solely as the corporate agent of Casren and/or BHPP with respect to the development of the hotel site. (2) From August 19, 1975, through July 29, 1977, CG and Argo acted in their own name and for their own account, and not as corporate agents, with respect to their ownership and operation of the golf course. (3) BHPP's allocation of losses to petitioners Carpenter, Fink and McCollister during the period of their participation in the partnership in 1977, lacked substantial economic effect. OPINION Issue 1. Attribution of losses
The first issue for decision is whether the losses incurred by *29 the construction and operation of the Biloxi Hilton Hotel project are attributable to Argo and/or CG, as respondent contends, or to BHPP, as petitioners contend. In particular, petitioners contend that the corporations acted solely as agents of the partnership, holding record title to the properties and obtaining project financing on behalf of the partnership solely because of local usury restrictions, in the case of Argo, and solely at the instigation of Bankers Trust, in the case of CG. As such, petitioners conclude, it is the partnership, as the principal, which is responsible for the tax consequences of the hotel project. Respondent answers that the losses generated by the project are properly attributable to the corporations since no agency relationship between them and BHPP has been established for tax purposes. In two recent Court reviewed opinions, Roccaforte v. Commissioner,77 T.C. 263 (1981), revd. 708 F.2d 986 (5th Cir. 1983), and Ourisman v. Commissioner,82 T.C. 171 (1984), on appeal (4th Cir., June 25, 1984), we have carefully considered the issue of whether a corporation will be treated as a nontaxable agent for a partnership. In each of those cases, the taxpayers *30 formed a partnership to construct and operate certain real estate developments. In order to secure financing for each project, the lenders required that the nominal borrower be a corporation in order to avoid local usury restrictions. As in the present case, corporations were formed which acquired record title to the properties involved and executed documents necessary to secure project financing. In each case, at least a number of the partners personally guaranteed the loans, and it was the understanding of the partners as well as the lenders that the corporation was to act as agent for the partnership, holding record title to the properties while the partners remained the true owners of the properties involved. In neither case did the corporation have any assets (other than record title to the properties) or perform services for any parties other than the partnership. Looking to the six-part test established by the Supreme Court in National Carbide Corporation v. Commissioner,336 U.S. 422, 437 (1949), we held on the facts and circumstances in Roccaforte and Ourisman that the corporations there involved acted as agents of their respective partnerships, which remained the true *31 owners of the projects, and that it was therefore the partnerships to which the tax consequences of the construction and operation of such projects flowed. The factors which comprise the National Carbide test are: (1) Whether the corporation operates in the name and for the account of the partnership; (2) whether the principal is bound by the actions of the corporate agent; (3) whether the corporate agent transmitted the money received to the partnership; (4) whether receipt of income is attributable to the assets or employees of the partnership; (5) whether the corporate agent's relationship with the partnership was dependent on the fact that it was owned and controlled by the partners; and (6) whether the corporation's activities were consistent with the normal duties of an agent. [12] *32 We believe that the facts disclosed in the instant case, viewed in light of these six National Carbide factors, compel the conclusion that for Federal income tax purposes, it was BHPP, and not Argo, that was the owner of the biloxi Hilton Hotel, but that it was CG and later Argo, and not BHPP, that were the owners of the golf course associated with such hotel. As to Argo, as early as 1973, when Yemelos and his accountant first met with Galloway concerning construction financing, the subject of the usury problem under Mississippi law was discussed and Yemelos stated his wish to use a *33 conduit corporation, a term which Galloway understood to mean a corporate agent which holds title for the equitable owner of property. Yemelos formed Argo in Louisiana for the purpose, inter alia, of taking certain actions relative to real estate to which it held title "as may be required of it by the beneficial owner or owners thereof * * *," and this purpose was reiterated in the application by which Yemelos later sought to qualify Argo to transact business in Mississippi. At that time, the owner of the hotel site was Casren, in which Yemelos had an 80 percent controlling interest. After MIW's rejection of the use of Galloway's corporate nominee, Conduit, as the agent which would hold title to the hotel property, it was decided that Argo would serve in such capacity. Argo's agency status was clearly disclosed in its October 5, 1973 trust agreement with Yemelos, and with the advent of BHPP as Casren's successor in December of 1975, in its nominee agreement with that partnership. Pursuant to both such agreements, Argo was prohibited from transacting any business for its own account. While it is true that the 1975 nominee agreement was not publicly recoded, the evidence amply demonstrates *34 that the primary institutions involved in financing the hotel project were aware of Argo's status as an agent. Both Galloway, acting as counsel to MIW, and Edward J. DeMartini, acting as counsel to and a director of Colonial, were aware that Argo held legal title to the hotel site solely as agent for Yemelos. DeMartini further testified that Argo's agency status was discussed at Colonial's director's meetings. The president of MIW, Peyton Fletcher III, confirmed that he was aware that Yemelos was the real borrower, and that his company was loaning the construction funds to a nominee corporation solely because of local usury laws. Fletcher also testified that he neither requested financial statements nor inquired as to the financial history or status of the corporate nominee, Argo. Consistent with the conclusion that MIW was well aware of Argo's agency status, the extensive documentation relating to agreements between Argo, BHPP and MIW executed on December 27, 1976, is replete with written declarations that Argo held the hotel properties for the benefit of BHPP. It is also significant that Yemelos and his wife provided a series of continuing construction loan guarantees in 1973, *35 1974 and 1975, personally guaranteeing the entire $8,000,000 indebtedness to MIW. It is clear that the lending institutions looked with respect to such guarantees to Yemelos in his individual capacity, and not, as contended for by respondent, as a shareholder of Argo. Thus, Colonial's DeMartini testified on cross-examination by respondent as follows: Q. So [the nominee corporation] served a convenience for the beneficial owner, correct? A. Well, no, I do not know if I would put it that way. It was simply * * * a project that was to be done. The person to do it was Mr. Yemelos and he was a valued customer of the bank and I guess [of] MIW also. * * * we were very pleased to have Argo on the note and Argo owning the property so long as we had Mr. Yemelos personally guaranteeing the note * * *. Q. Because you knew that Mr. Yemelos with his guarantee would at that point pay you back whereas you did not know anything about his wholly owned corporation? A. As far as I knew the wholly owned corporation did not have any assets at all but I was not concerned about that. Q. Because you knew that he was the borrower -- A. He was the borrower there was no doubt in my mind * * *. We *36 were making the loan to Mr. Yemelos and we were going to look to Mr. Yemelos for payment. Similarly, MIW's Fletcher testified that "Mr. Yemelos did put his name on the guarantee agreement and I was looking to the man that had the wherewithal to back up the investment that we were making." We note, finally, that on its Federal income tax returns for 1975, 1976 and 1977, Argo described itself as a "nominee" corporation which transacted no business for its own account. On this record, petitioners have clearly demonstrated Argo's qualification under the first National Carbide factor with respect to its development of the hotel site. As acknowledged by petitioners, the situation involving CG, which acquired and held title to the golf course until December 27, 1976, was "entirely different" from that of Argo. Unlike Argo, we have found that CG was used not to avoid local usury restrictions, but to meet the dual interests of Yemelos, who wished to limit his personal liability to $100,000, and of Bankers Trust, which wished to carry the full amount of the $1,045,000 note on its financial statements. There is no evidence in this record to show that these parties intended that CG would serve *37 as an agent to hold title for the beneficial interest of Yemelos. As with Argo, neither the note nor Yemelos' partial guarantee described CG as an agent. In contrast to Argo, however, no representative of the lending institution, Bankers Trust, testified at trial. Yemelos himself testified that the corporate entity was used for the "primary purpose" of limiting his own personal liability. While it is true that CG, like Argo, executed a nominee agreement with BHPP on December 31, 1975, it is clear that the existence of such an agreement is not conclusive proof of an agent-principal relationship. Ourisman v. Commissioner,supra, at 182. In the absence of any corroborative evidence, we conclude that CG was acting in its own name and for its own account during its ownership of the golf course between August 19, 1975 and December 27, 1976. As to the second National Carbide factor, we have found that the primary project creditors were aware that Argo acted as the corporate agent of Casren, and later, of BHPP. The Argo nominee agreement provided that BHPP remained the real party in interest with respect to the project, and indemnified Argo against any loss or liability arising through *38 its actions relative to the project. Yemelos and his wife personally guaranteed the entire $8,000,000 indebtedness to MIW, and BHPP expressly assumed liability therefor in december of 1976. It is evident that Yemelos, who controlled both Casren and BHPP, and who was a general partner of BHPP, considered himself bound by the acts of Argo. As to CG, clearly its actions did not bind the partnership. The primary project creditor was not aware that CG acted as a corporate-agent. Furthermore, in the event of a default by CG, the lender would only have had recourse to Yemelos to the extent of his $100,000 guarantee, which represented a small portion of the total indebtedness on the golf course. Yemelos' wish to limit his liability in this manner was a key reason for the use of CG. Turning to the third National Carbide factor, we note that neither corporation maintained a bank account. During construction of the hotel, most draws from MIW were paid to Galloway, counsel for MIW, who deposited them in a trust account, from which he issued checks to contractors or suppliers. In the few instances where checks were issued to Argo, they were endorsed by Argo and deposited into Casren's bank *39 account. To the limited extent that this factor pertains, therefore, it supports the position of petitioners. See Ourisman v. Commissioner,supra at 183. As to the fourth National Carbide factor, the corporations in this case had no employees, no assets beyond legal title to the hotel and golf course properties, and in July of 1977, they transferred title to such properties to the partnership. Neither corporation was capitalized, and all stock in each was owned by Yemelos and his wife, individually, and not by Casren or BHPP. At all relevant times, the partners believed themselves to be and generally acted as the owners of the hotel and golf course properties.Acting for Casren and/or BHPP, Yemelos established the putative corporate-agents, after acquiring the hotel site, and performed the activities necessary to arrange for financing, construction and operation of the hotel project. The activities of the corporations were essentially limited to holding record title, executing necessary loan documents, and endorsing certain loan advances to Casren. It is true, as respondent suggests, that Argo entered into two building contracts for the hotel project in 1973. We find it significant, *40 however, that Yemelos, who was well aware of Argo's nominee status, and who represented Casren, owned one-half of those building contractor corporations. We conclude on this record, as we did in Roccaforte and Ourisman, that the income realized from the hotel project and golf course was attributable to the efforts and assets of the partners. [13] With respect to the important fifth National Carbide factor, as we noted in Ourisman:
The one crucial question under National Carbide concerns the essential nature of the relationship between the purported corporate agent and its shareholders. * * * The Supreme Court expressly recognized that a corporation could act as an agent for its owners under certain circumstances * * * and specified the indicia of a true agency relationship. There is no indication that the Court intended to deny a corporation the status of agent for its shareholders in spite of the presence of the indicia of agency (factors one through four) merely because the agency is to some extent based upon the shareholders' control of the corporation (factor five). Ourisman v. Commissioner,supra at 185-186. In Roccaforte, *41 corporate stock was issued to all partners "in exactly the same percentages as their partnership interest," Roccaforte v. Commissioner, 708 F.2d at 987, and the putative corporate agent was not compensated for its services. On these facts, we found, and the Fifth Circuit concurred, that the corporation's relationship was dependent on the fact that it was owned and controlled by the partners. See also Ourisman v. Commissioner,supra.
On April 20, 1984, the Fifth Circuit decided Moncrief v. United States,730 F.2d 276 (5th Cir. 1984), distinguishing its earlier holding in Roccaforte on the critical fifth National Carbide factor. In Moncrief, the Fifth Circuit found that the taxpayer had satisfied the fifth factor where, unlike Roccaforte, the corporate stock was not issued to all partners in proportion to their partnership interests, but was wholly owned by the general partner, who held only a 25 percent interest in the partnership. See also Raphan v. United States,3 Cl. Ct. 457, 461-462 (1983). Acknowledging that there is a "tension" between its holding in Roccaforte that the fifth factor is absolute and mandatory and the Supreme Court's holding in National Carbide that "What we *42 have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor," National CarbideCorporation v. Commissioner,supra at 430, the Fifth Circuit nonetheless found it unnecessary to reconcile that tension in Moncrief since it was clear that the partnership was not the owner of the corporate agent. Moncrief v. United States,730 F.2d at 283. In a recent Memorandum Opinion of this Court, Bollinger v. Commissioner,T.C. Memo. 1984-560, finding that the taxpayer had satisfied the fifth National Carbide factor where his wholly-owned corporation performed services for seven partnerships, in five of which he held ownership interests ranging from 33-1/3 percent to 66-2/3 percent, we concluded that "[a]lthough [the corporation] was not compensated for the services it performed, because in at least five developments the partners did not own the stock of the corporation in the same percentage as their partnership interest, we believe that the agency relationship was not based upon the partners' ownership and control of both entities." In the instant case, Yemelos initially agreed to adopt Galloway's recommendation *43 to employ the services of Conduit, a corporate nominee in which neither he nor any other participant in Casren or partner in BHPP held any ownership interest, for a fee of $1,000.Specimen documents were prepared and transmitted to MIW for its approval. Faced with the opposition of the lending institution to the use of Conduit, however, and in view of the shortness of time before the scheduled loan closing, it was determined that Argo should be employed to hold title to the hotel site, and later, that CG should hold title to the golf course. All stock in Argo and CG was held by Yemelos and his wife. Yemelos' wife held no interest in Casren or BHPP. In 1975, Yemelos owned an 80 percent interest in Casren.From early 1976 until November of that year, Yemelos owned a 68.9 percent interest in Casren's successor, BHPP. From November of 1976 until the middle of December of 1977, Yemelos' interest was further reduced to 61.76 percent. While not free from doubt, we are persuaded on balance that the relationship of Argo and CG to Casren and BHPP was not dependent upon the ownership and control of the former two entities by the latter two entities. We thus conclude that the facts of the *44 instant case are distinguishable on this important point from the facts in Roccaforte, and that we are not bound by Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), to follow the result reached by the Fifth Circuit on different facts in that case. As to the sixth National Carbide factor, we believe that the activities of Argo, but not of CG, were entirely consistent with the normal duties of an agent. It is true that written nominee agreements ascribed an agency status to both corporations. While Argo's agency status was clearly revealed to significant third parties, however, CG's was not. Yemelos and his wife guaranteed the entirety of Argo's indebtedness, but for all except a small portion of CG's indebtedness, no guarantee was provided. The sole purpose of Argo's participation in the hotel project was to acquire financing for the partnership from lenders who wished to circumvent local usury laws, and its activities in pursuit of that purpose were fully consistent with the role of an agent. See Moncrief v. United States,supra at 286. On the other hand, CG was formed, as stated by Yemelos, for the primary purpose of limiting his liability, and *45 we are unable to find in its formation or activities the requisite indicia of a corporate agency. As we have found, the Biloxi Hilton Hotel project consisted of a number of separate parcels, together with improvements thereto. As to the Vapors Club and Stag Club parcels acquired by Yemelos on behalf of Casren on September 24, 1973, and then conveyed to BHPP on December 31, 1975, [14] and the S.B.A. parcel acquired by Yemelos on behalf of Casren on October 2, 1975, and then conveyed to BHPP on July 29, 1977, we face no issue of corporate agency. However, as to the 7.5 acre hotel site, which was conveyed to Argo on October 10, 1973, and the improvements constructed thereon, our analysis of the six National Carbide factors persuades us that Argo served as the agent of Casren from that date until December 31, 1975, and as the agent of BHPP from the latter date until July 29, 1977, when title thereto was conveyed to BHPP. As to the golf course, which was acquired by CG on August 19, 1975, our analysis under National Carbide persuades us that CG acted *46 in its own name, for its own account, and not as a corporate agent from that date until December 27, 1976, when title thereto was conveyed to Argo. Furthermore, between December 27, 1976 and July 29, 1977, when title to the golf course was conveyed to BHPP, there is no evidence to persuade us that Argo served as the corporate agent of BHPP as to the golf course property.
It is conceded by respondent that the tax consequences of the hotel project and golf course were properly attributable to BHPP during the period July 29, 1977 through December 31, 1977. We accordingly conclude that the partnership is entitled to claim all of the losses attributable to the construction and operation of the Biloxi Hilton Hotel project, except for those losses which are attributable to the golf course during the period August 19, 1975 through July 29, 1977. Exercising our best judgment in light of all of the evidence, Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930), affg. in part and revg. in part 11 B.T.A. 743 (1928), and considering that the cost of acquiring the golf course was approximately 11 percent of the total costs of acquisition and construction of the project, [15] we conclude that, *47 for the periods indicated, the losses claimed by BHPP relative to its construction and operation of the Biloxi Hilton Hotel project are allowable only to the following extent, and that petitioners were entitled to their distributive shares thereof, determined with reference to our disposition of Issue 2, infra:
Hotel Project
Golf Course
Claimed
Allowed
Disallowed
12/31/75
$684,999.00
$609,649.11
$75,349.89
1/1/76-10/31/76
969,358.94
862,729.45
106,629.48
11/1/76-12/31/76
598,594.00
532,748.66
65,845.34
1/1/77-7/28/77
575,447.00
512,147.83
63,299.17
7/29/77-12/15/77
704,741.00
704,741.00
12/16/77-12/31/77
593,913.00
593,913.00
Total
$4,127,052.94
$3,815,928.05
$311,123.88
Issue 2. Allocation of losses
The second issue for our decision is whether the allocation of losses among certain partners in commendam of BHPP possesses substantial *48 economic effect. As a threshold matter, however, petitioners contend that this matter is in issue solely as to those three petitioners who were newly admitted into the partnership on December 16, 1977 (McCollister, Carpenter and Fink). Respondent contends, on the other hand, that the matter is properly in issue for each petitioner who was a partner in BHPP during 1975, 1976 and 1977. We agree with petitioners. On brief, respondent makes the representations that "In the notices of deficiency, respondent disallowed certain losses claimed by petitioners * * * as distributive losses from BHPP," and that "The second theory for this disallowance was that the losses were allocated disproportionately, and that such allocation lacked substantial economic effect." Contrary to such representations, however, our examination of the deficiency notices and respondent's answers in each of the instant cases discloses no reference to the so-called "second theory" now contended for. Rather, the deficiency notices disallow petitioners' distributive shares of the subject losses, as to all petitioners, on the grounds of the foregoing corporate-agency issue, and as to eight of the petitioners who were *49 admitted into the partnership on December 31, 1975, [16] on the alternative grounds of disallowance of their distributive shares of any losses sustained by the partnership prior to such admission date. This retroactive allocation issue was conceded by petitioners, and is not in issue in these proceedings. Respondent's so-called "second theory," respecting the allocation of bottom line losses within the partnership, has been placed in issue solely in those six cases in which respondent filed amended answers, and for the first time by such amended answers. [17] As noted in footnote 6, respondent at trial conceded increased deficiencies relating to this issue as to three of these six petitioners. When asked by the Court whether he was withdrawing his amended answers as to these three petitioners, respondent *50 replied in the affirmative. It is clear that respondent seeks to raise an alternative theory in each of the instant cases. It is equally clear that such new matter must be properly pleaded by respondent. Estate of Horvath v. Commissioner,59 T.C. 551, 556 (1973); Tauber v. Commissioner,24 T.C. 179, 185 (1955). If the new matter is raised neither in the pleadings nor in an amendment thereto, then the issue ordinarily will not be heard by this Court. Rollert Residuary Trust v. Commissioner,80 T.C. 619, 636 (1983), on appeal (6th Cir. August 29, 1983); Markwardt v. Commissioner,64 T.C. 989, 997 (1975); Estate of Mandels v. Commissioner,64 T.C. 61, 73 (1975); Robertson v. Commissioner,55 T.C. 862, 865 (1971). Since respondent has properly pleaded this new matter in only six *51 of the instant cases, and then has withdrawn such pleading in three of those, and since we conclude that petitioners in the remaining fourteen docketed cases have had no fair notice of such matter, Markwardt v. Commissioner,supra at 997; Rule 31(a), [18] we proceed to a consideration of this second issue in the only three cases with respect to which it is properly before this Court, to wit: Docket No.
David R. Carpenter
26988-82
Erica J. Carpenter
Kenneth G. Fink, Jr.
26993-82
Carol Fink
Donald L. McCollister
26994-82
Sandra M. McCollister
Respondent, as he has acknowledged, bears the burden of proof on this rule. Rule 142(a). Section 704(a) generally provides that a partner's share of income, gain, loss, deduction, or credit shall be determined by the partnership agreement. For the tax year in issue, the general rule is limited by section 704(b), which provides that an allocation will be disregarded if it lacks substantial economic effect.[19] Pursuant *52 to this test, an allocation of bottom line income or loss, or any item thereof, must have economic substance in the sense that it reflects the actual division of income or loss among the partners when viewed in light of economic, rather than tax, consequences. Goldfine v. Commissioner,80 T.C. 843, 850 (1983). Thus, the partner to whom an item is allocated for tax purposes must also bear the economic benefits and burdens of that item. Goldfine v. Commissioner,supra at 851. In order to have substantial economic effect, a partner's allocation of bottom line income or loss, or of any item thereof, [20] *53 must meet the test enunciated by this Court in Goldfine, as follows: If a partner's allocation of an item of income or deduction is reflected in his capital account and if the liquidation proceeds of the entity are distributed in accordance with the capital account balances, the allocation has substantial economic effect. [Citation and footnote omitted.] Moreover, where a partner's capital account registers a deficit, he must have the obligation upon liquidation to restore that deficit. Absent such an obligation, the other partner or partners would have to bear part of the economic cost of the special allocations that resulted in the deficit capital account. Goldfine v. Commissioner,supra at 852. [21]
In the instant case, petitioners David R. Carpenter, Kenneth G. Fink, Jr. and Donald L. McCollister each became partners in commendam of BHPP for the first time on December 16, 1977, acquiring their partnership interests as follows: Percentage
Petitioner
partnership interest
Contribution
Carpenter
.5  $50,000
Fink
1.488
148,800
McCollister
.3  30,000 As we have found, there were six partners in commendam who were newly admitted pursuant to the second amended partnership agreement, including Carpenter, Fink and *54 McCollister. From the time of their admission until December 31, 1977, these six partners were allocated 97.2 percent of all of BHPP's items of profit and loss. Collectively, these six partners owned a 5.888 percent interest in the partnership. As we have also found in section I, supra, the partnership was entitled to losses in the amount of $593,913, as claimed, for that same period. On their individual returns for 1977, Carpenter, Fink and McCollister claimed as their distributive shares of such losses, the respective amounts of $49,022, $145,890, and $29,413. [22] In support of his contention that the allocation of losses to the foregoing petitioners in 1977 lacked substantial economic effect, respondent contends, first, that where the capital accounts of such petitioners registered a deficit, they would not have the obligation to restore that deficit upon liquidation, and second, that the liquidation proceeds of *55 BHPP would not be distributed in accordance with capital account balances. There is no dispute herein that the allocation of losses to petitioners Carpenter, Fink and McCollister were reflected in their capital accounts for 1977. Based upon the stipulation of the parties to the effect that each partner in commendam, including the three subject petitioners, would so testify, we have found that in the event of liquidation of the partnership, partners registering deficit balances in their capital accounts would not be required to restore such deficits. However, the factual circumstances here differ from those in Goldfine and Orrisch v. Commissioner,55 T.C. 395 (1970), affd. per curiam, an unreported opinion (9th Cir. 1973), where we held that where a partner's capital account registers a deficit, he must have the obligation upon liquidation to restore that deficit. Goldfine v. Commissioner,supra at 852; Orrisch v. Commissioner,supra at 403-404. In the instant cases, none of the capital accounts of the three petitioners registered a deficit at the end of 1977. [23] Since they maintained positive account balances, no partner would bear more than his share of the economic cost of the *56 loss allocation. On these facts, the absence of an obligation to restore a capital account deficit upon liquidation does not alone invalidate the allocations in issue. [24] We turn next to a consideration of whether respondent has met his burden of proving that the proceeds upon liquidation of BHPP would not be disbributed *57 in accordance with capital account balances under the December 16, 1977 amendment to the partnership agreement. Pursuant to the amended agreement, upon a sale of all or part of BHPP's property, the proceeds would be distributed, in the "sole discretion" of the general partners, to certain preferred groups, and then in the following percentages to certain generic groupings of partners in commendam, including an allocable percentage of 14.710 for the newly admitted partners. Within each such grouping, the proceeds would be distributed in proportion to each partner's ownership of "partnership stock." The "newly admitted" grouping consisted of the six partners admitted on December 16, 1977, including Carpenter, Fink and McCollister, to whom were allocated a 97.2 percent share of losses for the period during which they were partners in 1977. Thus, in the event of a sale in liquidation, these six partners would receive almost 15 percent of the proceeds, without regard to their capital accounts or to adjustments thereto resulting from the percentage share of losses to which they were entitled during their participation in the partnership in 1977. Furthermore, as to distributions within *58 the grouping of six "newly admitted" partners, the proceeds of any liquidation were to be distributed in proportion to the ownership of "partnership stock" by each such partner. The amendment to the partnership agreement defines "partnership stock" as "cash or other property furnished to the Partnership by a Partner as set out in Article 2808 of the Revised Civil Code of Louisiana and other applicable law, as amended." [25] By contrast, "capital account" is defined in the amendment so as to include the original contribution of each partner, adjusted for additional contributions, allocable gains or losses, withdrawals by a partner, and distributions to a partner. It is therefore clear that the 14.710 percentage to which the six new partners would be entitled in the event of a liquidation, would be distributed among such partners in a proportion which would not be based upon their capital account balances. Since the proceeds upon liquidation of BHPP would *59 not be distributed to petitioners Carpenter, Fink and McCollister in accordance with their capital account balances, we conclude that respondent has met his burden of proving that the subject allocations of losses were without substantial economic effect. Allison v. United States,701 F.2d 933, 940 (Fed. Cir. 1983); Goldfine v. Commissioner,supra at 856. [26]
Where an allocation of losses lacks substantial economic effect, section 704(b) requires that the partner's distributive share of such losses shall be "determined in accordance with the partner's interest in the partnership * * *." By stipulated agreement of the parties, such distributive shares for the three subject petitioners in 1977 have been determined to be as follows: Petitioner
Distributive share of
partnership loss - 1977
Carpenter
$2,969.57
[27] Fink 8,837.43
McCollister
1,781.74 To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. By our Order dated January 9, 1984, granting petitioners' motion to consolidate, which was not opposed by respondent, cases of the following petitioners were consolidated herewith: James M. George and Margaret C. George, Docket No. 14917-81; Gary R. Frink and Sherry R. Frink, Docket No. 17023-81; Hollis O. Graham and Ida G. Graham, Docket No. 26983-82; George A. Wolcott and Dorothy Wolcott, Docket No. 26984-82; Tuncay Ertan and Nona G. Ertan, Docket No. 26985-82; Caroline Norton, Executrix, Estate of Coman S. Norton, Docket No. 26986-82; Roland M. Toups and Kathryn B. Toups, Docket No. 26987-82; David R. Carpenter and Erica J. Carpenter, Docket No. 26988-82; Charles A. Prince and Ruth O. Prince, Docket No. 26989-82; Harry R. Layne and Janet J. Layne, Docket No. 26990-82; Stephen G. Abshire and Mary B. Abshire, Docket No. 26991-82; Janet F. Baum, Docket No. 26992-82; Kenneth G. Fink, Jr. and Carol Fink, Docket No. 26993-82; Donald L. McCollister and Sandra M. McCollister, Docket No. 26994-82; Robert A. Rayford and Iris B. Rayford, Docket No. 27128-82; Frem F. Boustany, Sr. and Beatrice J. Boustany, Docket No. 27291-82; Frem F. Boustany, Jr. and Angell F. Boustany, Docket No. 27292-82; Sidney Frederick and Irene S. Frederick, Docket No. 4048-83; Roland M. Toups and Kathryn B. Toups, Docket No. 7720-83.↩
2. Respondent has conceded the additions to tax under sec. 6651(a), which he had determined as to petitioners Norton and Baum in Docket Nos. 26986-82 and 26992-82, respectively. 3. Petitioners George concede $3,000.50 of this deficiency, as determined by respondent for 1976. ↩
4. This determination and that made in Docket No. 26992-82, were made with respect to the joint and several liability of Coman Norton, deceased, and Janet F. Baum (formerly Janet F. Norton), his wife during the years in issue and petitioner in the latter case. ↩
5. Petitioners Rayford concede the deficiency determined against them for 1978.↩
6. Increased deficiencies asserted by amended answer by respondent in Docket Nos. 27291-82, 27292-82, and 7720-83, were conceded by respondent at trial.↩
7. In all material respects, a partner in commendam under La. Civ. Code Ann. art. 2839-2851, (West 1952), is a limited partner. Tatum v. Acadian Production Corp.,35 F. Supp. 40 (E.D. La. 1940↩)
8. Pursuant to Miss. Code Ann. § 75-17-1↩ (1972), as to non-corporate entities, the "legal rate" of interest in 1973 was 6 percent per annum, but contracts could be made for payment of a rate as high as 8 percent.
9. The date of another affidavit, executed in connection with the $800,000 supplemental financing in 1975, cannot be determined on this record.↩
10. A dash indicates that there was no change in the partner's ownership interest. 11. In an apparent misspelling, Wolcott is referred to in the articles as "Wilcott."↩
12. In Roccaforte v. Commissioner,7 T.C. 263 (1981), revd. 708 F.2d 986 (5th Cir. 1983), the Fifth Circuit, reversing the finding of this Court, held that the fifth National Carbide factor is mandatory and absolute. 708 F.2d at 989. However, in Ourisman v. Commissioner,82 T.C. 171 (1984), on appeal (4th Cir. June 25, 1984), we disagreed with the Fifth Circuit's holding on this point, and followed our decision in Roccaforte. Since, with the exception of Docket Nos. 12544-80 and 17023-81, with respect to which appeal would lie to the Fourth Circuit, appeal of the remaining eighteen of the instant docket numbers would lie to the Fifth Circuit, we are bound to follow the holding of the Fifth Circuit in Roccaforte with respect to such cases - that the fifth factor of National Carbide is mandatory and absolute. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). As to Docket Nos. 12544-80 and 17023-81, however, we shall adhere to our holdings in Roccaforte and Ourisman.↩
13. See also Bollinger v. Commissioner,T.C. Memo. 1984-560↩.
14. We are unable to conclude on this record that title to these parcels was ever conveyed to Argo, CG or any other purported corporate agent.↩
15. We have derived this percentage as a ratio of the cost of the golf course to the approximate costs of the entire project, determined as follows: ↩
Golf course
$1,045,000
Hotel site
225,000
Vapors/Stag parcels
376,566
S.B.A. parcel
210,000
MIW construction loans
6,700,000
500,000
800,000
Hilton license or franchise
20,000
Approximate total project costs,
exclusive of personal property
$9,876,566
16. These include petitioners Wolcott, Ertan, George, Graham, Toups, Layne, Abshire and Rayford.As to the four additional petitioners admitted on that date, respondent determined no deficiencies against petitioners Prince and Norton for 1975, and failed to raise the retroactive allocation issue by way of the deficiency notice or his answers, against petitioners Frink and Frem F. Boustany, Sr.↩
17. It is clear that the retroactive allocation of losses for partners entering BHPP late in 1975, and the substantial economic effect of the allocation of losses under the partnership agreement, as amended, for 1975 through 1977, are distinct issues. Indeed, respondent emphasizes this distinction on brief, cautioning that "Petitioners appear to confuse disproportionate allocation and retroactive allocation."↩
18. All references to Rules are to the Tax Court Rules of Practice and Procedure, and all statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise stated.↩
19. Sec. 704 was amended by sec. 213(d), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1548. Sec. 704(b), as amended, replaced the former tax avoidance or evasion test with the substantial economic effect test, for taxable years beginning after December 31, 1975.↩
20. As recently noted by this Court, "[W]hatever the distinctions under pre-1976 law between 'item' allocations and 'bottom line' allocations, a discussion at long last laid to rest by the Tax Reform Act of 1976 * * *." Goldfine v. Commissioner,80 T.C. 843, 855 (1983). 21. See also Hirsch v. Commissioner,T.C. Memo. 1984-52↩.
22. These deductions were apparently computed by applying to this 97.2 percent share of the losses for 1977, or $577,283.43, a fraction consisting of the ratio of each petitioner's partnership interest to the total 5.888 percent interest of the newly admitted partners.↩
23. As we have found, Carpenter, Fink and McCollister registered positive capital account balances at the end of 1977 in the respective amounts of $978, $2,910, and $587. Compare sec. 1.704-1(b)(2)(ii), Prop. Income Tax Regs., 48 Fed. Reg. 9871 (1983), which provides in pertinent part, as follows: The determination of whether an allocation has economic effect is made as of the end of the partnership taxable year to which the allocation relates. Thus, the fact that a partner is not required to restore the deficit in his capital account * * * does not invalidate an allocation (or that portion of an allocation) to such partner to the extent the allocation does not create a deficit in such partner's capital account at the end of the partnership's taxable year provided the other requirements of this subdivision are satisfied. ↩
24. See Dibble v. CommissionerT.C. Memo. 1984-589↩.
25. La. Civ. Code Ann. art. 2808 (West 1952), provides as follows: Property, when brought into partnership, or acquired by it, and the profits, when they are kept undivided for the benefit of the partnership, are called partnership stock.↩
26. Compare sec. 1.704-1(b)(2)(ii), Prop. Income Tax Regs., 48 Fed. Reg. 9871↩ (1983).
27. In an apparent typographical error, the stipulation refers to "Kenneth G. Frink, Jr.," to rather than petitioner Kenneth G. Fink, Jr.↩