**Joseph A. ROCCAFORTE, Jr. and Sandra F. Roccaforte, et al., Petitioners-Appellees Cross-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant Cross-Appellee.**

No. 82–4048.

United States Court of Appeals, Fifth Circuit.

July 5, 1983.

Rehearing and Rehearing En Banc Denied Aug. 30, 1983.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Robert T. Duffy, Stanley S. Shaw, Jr., Michael L. Paup, Chief, Appellate Section, Dept. of Justice, Washington, D.C., John H. Menzel, I.R.S., Washington, D.C., for respondent-appellant cross-appellee.

D. Irvin Couvillion, Baton Rouge, La., for petitioners-appellees cross-appellants.

Before THORNBERRY, GEE and REAVLEY, Circuit Judges.

THORNBERRY, Circuit Judge:

INTRODUCTION:

The Commissioner of Internal Revenue appeals the Tax Court's decision that Glenmore Manor Apartments, Inc. [GMA] was a true, non-taxable corporate agent of its principals. *Roccaforte v. Commissioner,* 77 T.C. 263 (1981). We reverse, concluding

that the Tax Court misapplied the test of agency status set out in *National Carbide Corporation v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), and therefore erred in its determination that GMA was a true, non-taxable corporate agent.

## FACTS AND PROCEDURAL HISTORY:

In late 1972, Jack N. Dyer, Sr., Jack N. Dyer, Jr., and Ronald Dyer decided to build an apartment complex. In March 1973, they acquired a suitable plot of land [Lot F], and by June had succeeded in convincing ten others to join them in forming a partnership to develop the complex. Louisiana National Bank [LNB] agreed to lend the Dyers $635,000 as a construction loan. However, because corporations were not covered by a Louisiana usury statute which limited to 10 percent the rate of interest chargeable on loans to individuals and partnerships,[1] LNB required that the loan be made to a corporation.

Accordingly, in October 1973 the Dyers organized GMA. Stock was issued to the Dyers and the other partners in exactly the same percentages as their partnership interests. Although its articles of incorporation empowered GMA to perform all lawful corporate activities, the partners entered into a "nominee" agreement under which GMA agreed to act only upon the express authorization of the partners. Under this agreement, GMA received legal title to Lot F; all beneficial interest was reserved to the partners. GMA agreed to remit all proceeds of the venture to the partners. In return for its services, GMA was to be reimbursed its expenses, but otherwise was to receive no fee for its services. In October 1973, the partners directed GMA to take title to Lot F, enter into a construction contract, arrange for and sign agreements for construction and permanent funding, accept the project upon completion, and take steps to rent the planned apartments in the complex. Shortly thereafter, the Dyers transferred Lot F to GMA for a stated consideration of $76,000; in reality, however, GMA paid no money for the transfer.

GMA then executed a mortgage to LNB. The accompanying loan carried a 12.75 percent interest rate, a figure which exceeded the 10 percent maximum rate set by the State usury laws for loans to individuals. The loan was secured both by Lot F and by the improvements to be constructed on the Lot. LNB was aware that GMA had been created solely to avoid the usury laws.

The partners then executed an agency agreement with GMA. This agreement reaffirmed the nominee agreement, and stated that GMA, as an agent, disclaimed any ownership interest in Lot F or the planned improvements. The agreement further provided that all lenders were to be informed of GMA's agency status, and that all debts incurred would be those of the partners, not GMA. The partners agreed to hold GMA harmless from any liabilities arising from the project, and to be brought in as third-party defendants in any suit brought against GMA. GMA agreed not to engage in any business activities unless directed to do so by the partners. Although this document provided that GMA was to be compensated for its services, it was never reimbursed for any of its expenses, nor paid a fee for any services it rendered. The Dyers then wrote a letter to LNB, reaffirming GMA's status as a nominee corporation formed solely to circumvent the State's usury laws.[2]

In late October 1973, GMA contracted with JDA Construction, Inc., a corporation owned by the Dyers, to build the development. As the project neared completion,

---

**1.** La.Rev.Stat.Ann. § 9:3503 (West). Corporations were exempt from restrictions on interest rates. La.Rev.Stat.Ann. § 12:703 (West).

**2.** This letter stated in pertinent part:

The above captioned corporation is a Nominee Corporation. This means that the corporation was formed solely for the purpose of receiving loan proceeds from the permanent lender and the interim lender. This corporation has no assets, it has no liabilities, it has no income, and it has no expenses. This corporation functions solely as an agent in order to accommodate the lender to avoid subjecting the permanent and the interim lenders to the State Usury Laws.

the Dyers engaged Collateral Investment Co. [CI] to help obtain permanent financing. In June 1974, First Federal Savings and Loan Association [FFSL] of Pittsburgh, Pennsylvania sent the Dyers a commitment letter in the amount of $750,000. FFSL's letter referred to "Jack N. Dyer, Sr. and Jack N. Dyer, Jr., General Partners of a Limited Partnership" as mortgagor, and required that the mortgage be personally guaranteed by the two Dyers and their wives.

GMA accepted the completed apartment project in June 1974. In October of that year, GMA closed the permanent financing loan, and issued a full recourse note, guaranteed by the two Dyers and their spouses, to CI. CI immediately assigned this note, without recourse, to FFSL. CI stayed on as a servicing agent for the note. In response to repeated inquiries by CI, Jack N. Dyer, Jr. confirmed by letter to CI that GMA was merely an agent, without income, expenses or assets, formed solely for the purpose of receiving FFSL's loan.

Because of the increased cost of the project, the Dyers in September 1974 reduced their partnership interests from 40 to 20 percent in favor of the other investors.

The complex developed chronic cash-flow problems. In May 1975, the partners directed GMA to obtain a second trust loan of $90,000 from Baton Rouge Bank and Trust. The note was endorsed by several partners, including the Dyers. The project's cash-flow problems continued over the next few months, and the partners were asked to make additional capital contributions. Some did, others refused. On December 31, 1975, three new partners were brought in for a combined investment of $30,666. They received a total of a ten percent interest in the partnership. These partners believed that GMA was only an agent of the partnership; one of them testified that he would not have invested had he believed he was investing in a corporation, instead of a partnership. The new partners received no stock in GMA.

GMA filed corporate income tax returns for 1973 through 1976, but reported no income, losses, assets or liabilities, stating on its returns that it was a nominee which engaged in "no activity."

The partners filed individual tax returns for these years. The Commissioner disallowed the partners' deductions of expenses arising from the operation of the apartment complex in 1975 and 1976, concluding that these losses were actually those of GMA. The partners brought suit to recover the disallowed deductions. They conceded that GMA was a viable entity which could not be disregarded for tax purposes. However, they argued that because GMA was operated solely as their agent, any losses incurred were properly those of the partners, and not those of GMA.

Relying upon *National Carbide Corporation v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), the Tax Court found that GMA was a true agent of the partnership, and that the expenses generated by the apartment complex were properly those of the partners. Having decided the principal issue in the taxpayers favor, the court further concluded that the partners could not allocate 67 percent of the 1975 partnership deductions to the new partners admitted on December 31, 1975. It held that the new partners were entitled only to deductions for expenses allocable to the single day of December 31, 1975.

The Commissioner appealed the Tax Court's decision on the principal issue. Taxpayers herein, all of whom are partners claiming deductions retroactively to the beginning of 1975, cross-appealed from the Tax Court's denial of retroactive partnership allocations. Since the taxpayers conceded this issue and withdrew their cross-appeal at oral argument, we do not address this issue here.

ANALYSIS:

█ The taxpayers concede that GMA carried on sufficient business activity to require that it be recognized as a separate corporate entity. *See Moline Properties,*

*Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943).[3]

However, they urge that we affirm the Tax Court's determination that GMA qualifies as a non-taxable agent under the test set out in *National Carbide.*

While rejecting petitioner's claim that it was a non-taxable agent, the Supreme Court in *National Carbide* nonetheless held open the possibility that an otherwise separate taxable corporate entity could, in some circumstances, qualify as a non-taxable agent of its principal.

> What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. [1] Whether the corporation operates in the name and for the account of the principal, [2] binds the principal, by its actions, [3] transmits money received to the principal, and [4] whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. [5] *If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case.* [6] Its business purpose must be the carrying on of the normal duties of an agent.

*National Carbide,* 69 S.Ct. at 734 (emphasis added).

In the present case, the Tax Court found that the taxpayers had established in their favor conditions 1, 2, 4 and 6 *supra.* Condition 3 was deemed inapplicable because "the ongoing construction and management of an apartment complex is not the type of undertaking in which an agent would regularly transmit moneys to the principal." The court found that GMA failed to satisfy only the fifth condition above, concluding that its relations with the partners depended upon the fact that it was owned by them. Treating all of these conditions as factors entitled to equal weight, the court held that the "entire substance" of the transaction established an agency relationship.

While we agree with the Tax Court's factual determination as to each separate condition, we are forced to reject both its overall assessment of their relative weights, and its conclusion that GMA was a true corporate agent as that term is defined in *National Carbide.*

■ The first four conditions set out in *National Carbide* are general principles of agency law, and serve only as "relevant considerations" in the determination of true agency status. The fifth and sixth conditions, however, are mandatory and absolute. The plain language of National Carbide admits of no other interpretation. The fifth condition states that in order to be a true agent, a corporation's "relations with its principal *must not be dependent* upon the fact that it is owned by the principal." *Id.* The sixth condition is framed in equally mandatory language. The fifth and sixth conditions are not mere factors of uncertain weight; they are prerequisites which must be satisfied before a corporation can qualify as a true agent. The Tax Court correctly determined that GMA failed to satisfy the

---

3. In *Moline Properties,* the Supreme Court set out certain criteria for determining whether a corporation is a separate taxable entity:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

*Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943) (citations omitted). *See also Crouch v. United States,* 692 F.2d 97, 99 (10th Cir.1982) (Courts have consistently interpreted *Moline Properties* to preclude ignoring the corporate form when adoption of that form has served a business purpose. A corporation organized to avoid the effect of state usury laws has engaged in sufficient business activity to be recognized as a taxable entity.).

mandatory fifth condition.[4] We therefore conclude as a matter of law that GMA is not a true nontaxable corporate agent. Our holding is supported by a number of decisions by courts applying the *National Carbide* test.

In *Collins v. United States,* 386 F.Supp. 17 (S.D.Ga.1974), *aff'd,* 514 F.2d 1282 (5th Cir.1975), plaintiffs purchased unimproved property as tenants-in-common for the development of an apartment complex. Because the lowest interest rate available for temporary financing was usurious under the laws governing loans to individuals, the owners formed a corporation to act as the borrower. As in the present case, the lenders knew that the corporation was merely a vehicle for avoiding the usury laws, and recognized that they were actually dealing with the owners of the land.

The district court rejected the owners' argument that the corporation was a nontaxable agent, finding that it failed to meet the mandatory fifth and sixth conditions of *National Carbide. Id.* at 21. In its opinion, the court did not even mention the first four conditions of *National Carbide,* setting out general principles of agency law. This Court affirmed, describing the district court's reasons as "well-stated." *Collins v. United States,* 514 F.2d 1282, 1283 & n. 2 (5th Cir.1975).

Similarly, in *Harrison Property Management Co. v. United States,* 475 F.2d 623 (Ct.Cl.1973), *cert. denied* 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974), three individuals formed a corporation in which they owned all the stock. They transferred title to some oil properties to this corporation, retaining beneficial ownership. The Court of Claims found that the corporation was not a non-taxable agent because it failed to meet the fifth, mandatory condition of *National Carbide.*

[T]he significant criteria, as we understand them, are whether the so-called "agent" would have made the agreement if the so-called "principals" were not its owners, and conversely whether the "principals" would have undertaken the arrangement if the "agent" were not their corporate creature.

*Id.* at 627.

In *Jones v. Commissioner,* 640 F.2d 745 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981), several partners established a corporation to take title to property and act as the borrower on a loan whose interest rate would otherwise have violated the state's usury laws. We held in that case that because the taxpayers had "failed to produce any evidence with respect to the *crucial* fifth and sixth *National Carbide* factors," the corporation was not a true agent. *Id.* at 755 (emphasis added). The fifth and sixth conditions of *National Carbide* are "crucial" precisely because they are mandatory.

Our holding today is also supported by strong policy considerations. Closely-held corporations often function as agents or surrogates for their owners. Under *Moline,* however, they are treated as separate, taxable entities. If a taxpayer could, by the simple expedient of relying upon characteristics common to all such corporations, avoid tax liability, the separate entity regime would collapse. To prevent abuse, the taxpayer should be required to show more than those agency attributes that arise naturally from ownership and control of the corporation—he should be required to show that an agency relationship could exist independent of such ownership and control. This is precisely what the mandatory fifth condition of *National Carbide* requires.

REVERSED.

---

**4.** The Court found that: (1) the partners owned 100% of GMA's stock; (2) GMA was controlled and dominated by the partners; (3) GMA and the partners did not deal at arms' length; (4) GMA was not compensated for the services it performed. The testimony also shows that GMA rendered no services for other principals, and was never even reimbursed by the partners for its expenses.