**Gary R. FRINK, Sherry R. Frink, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant. (Two Cases)**

**Gary R. FRINK, Sherry R. Frink, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**Nos. 85–2226 to 85–2228.**

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1986.

Decided Aug. 8, 1986.

Rehearing and Rehearing In Banc Denied Sept. 16, 1986.

Teresa McLaughlin, Tax Div., U.S. Dept. of Justice (Roger M. Olsen, Acting Asst. Atty. Gen., Michael L. Paup, Ann Belanger Durney, Washington, D.C., on brief), for appellant/cross-appellee.

F. Kelleher Riess (F. Kelleher Riess Corp., Metairie, La., on brief), for appellees/cross-appellants.

Before PHILLIPS and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The Commissioner appeals the Tax Court's judgment that a real estate partnership could deduct the losses of Argo Hotels, Inc., in 1975, 1976, and 1977, because Argo was the nontaxable agent of the partnership. The taxpayers, who were investors in the partnership, appeal the court's judgment allocating 11% of the enterprise's losses to Coastal Golf, Inc.[1] The taxpayers contend that some of these losses were incurred by Argo. Because the taxpayers failed to establish that Argo's relationship with the partnership was not dependent on the partnership's control of Argo, we reverse the court's judgment that Argo was the nontaxable agent of the partnership. *See National Carbide Corp. v.*

---

1. The taxpayers were partners in commendam. La.Civ.Code Ann. arts. 2839–2851 (West 1952). In all material respects they were limited part-ners. *See Tatum v. Acadian Production Corp.,* 35 F.Supp. 40, 46 (E.D.La.1940).

*Commissioner,* 336 U.S. 422, 437, 69 S.Ct. 726, 734, 93 L.Ed. 779 (1949); *Ourisman v. Commissioner,* 760 F.2d 541, 547–48 (4th Cir.1985). We affirm the court's judgment allocating 11% of the enterprise's losses to Coastal Golf because this allocation was reasonably based on the evidence introduced at the trial. Furthermore, the court did not abuse its discretion in denying the taxpayers' motion to reopen the case for the presentation of additional evidence concerning the allocation of losses.

## I

The facts are set forth in the Tax Court's opinion and may be summarized here. *See Frink v. Commissioner,* 1984 T.C.M. (P–H) ¶ 84,669, at 2713–22. In 1972, John C. Yemelos formed a real estate partnership for the purpose of developing a hotel in Biloxi, Mississippi. Yemelos later formed an enlarged partnership as new investors, including the taxpayers, joined the venture. At all times, Yemelos's interest in the partnership exceeded 50%, and he was one of two general partners.

Mississippi usury laws limited the amount of interest that could be charged noncorporate borrowers. Because this restriction did not apply to corporate borrowers, an attorney for the lender suggested that Yemelos transfer title to the hotel site to C.M. Conduit, Inc., which the attorney owned. Conduit would hold legal title for the benefit of the partnership and borrow money for the project in return for a $1,000 fee. Yemelos agreed to this arrangement, but the lender objected, in part because of the word "Conduit" in the corporation's name. The parties agreed instead to transfer title to Argo. Yemelos and his wife each owned 50% of Argo and guaranteed its indebtedness. All of the parties to the loan transaction understood that Argo held legal title for the partnership, which was the real owner of the property.

On August 1, 1975, Yemelos and his wife also formed Coastal Golf, which was used to purchase a golf course as part of the hotel project. Unlike Argo, Coastal Golf was not needed to circumvent Mississippi's usury laws. Instead, Yemelos created the corporation in order to limit his personal liability while enabling the lender to carry the full amount of Coastal Golf's promissory note on its financial statements.

Both Argo and Coastal Golf entered into nominee agreements with the partnership. Argo's agreement provided that it would act only for the account of the partnership, the partnership would indemnify it for any loss or liability, and it would hold title solely as nominee for the equitable, legal and beneficial ownership of the partnership. Coastal Golf's agreement provided in similar terms that it held title to the golf course as nominee of the partnership. Neither corporation served anyone besides the partnership. In 1976 Coastal Golf transferred title to the golf course to Argo, and in 1977 Argo transferred title to the hotel and golf course to the partnership. The nominee agreements did not provide for compensation to Argo or Coastal Golf, but in 1980 the partnership paid each corporation $100 for its services. Each reported this income on its tax returns. The Tax Court found that both Argo and Coastal Golf were viable, active corporations that performed extensive business activities during the taxable years in question.

The partnership claimed losses for the construction and operation of the hotel project on its returns for 1975, 1976, and 1977. The taxpayers deducted their distributive share of these losses. The Commissioner determined that the losses were attributable to Argo and Coastal Golf and disallowed the deductions.

The Tax Court held that Argo was the partnership's nontaxable, corporate agent. Therefore, the partnership could deduct Argo's losses. The court also held that Coastal Golf was not the partnership's agent because it acted in ints own name and for its own account. Therefore, its losses could not be deducted. The court allocated 11% of the losses to Coastal Golf because the cost of acquiring the golf course was 11% of the total acquisition and construction costs of the project. After the court issued its decision, the taxpayers

moved to reopen the case in order to show that Coastal Golf's losses were less than 11% of the project's losses. The court denied this motion.

## II

In *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 437, 69 S.Ct. 726, 734, 93 L.Ed. 779 (1949), the Court ruled that a corporation may act as the nontaxable agent of its shareholders. The Court stated:

> Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent.

*National Carbide* recognized an exception to the general rule, set forth in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), that corporations are separate taxable entities.

In *Ourisman v. Commissioner*, 760 F.2d 541 (4th Cir.1985), we considered whether a corporation formed to circumvent state usury laws qualified as the nontaxable agent of a real estate partnership.[2] Reversing the Tax Court, we held that the fifth *National Carbide* factor—that the corporation's "relations with its principal must not be dependent upon the fact that it is owned by the principal"—was a prerequisite to agency status. 760 F.2d at 547–48; *accord Roccaforte v. Commissioner*, 708 F.2d 986, 989–90 (5th Cir.1983). The principles explained in *Ourisman* govern this case.

## III

The Tax Court's judgment was largely premised on the fact that there was not a complete identity of ownership in Argo and the partnership. The court noted that Yemelos had a majority interest in the partnership but only had a 50% stake in Argo. Yemelo's wife owned the rest of Argo's stock, but she was not an investor in the partnership. The court ruled that this disparity of ownership interests distinguished this case from *Roccaforte* in which the investors in the partnership owned the nominee corporation in exact proportion to their partnership interests. The taxpayers argue that *Ourisman* is also distinguishable because in that case, as in *Roccaforte*, there was a complete identity of ownership in the corporation and the partnership. The taxpayers contend that *Raphan v. United States*, 759 F.2d 879 (Fed.Cir.1985), and *Moncrief v. United States*, 730 F.2d 276 (5th Cir.1984), support the court's ruling.

The taxpayers' reliance on *Moncrief* is misplaced because the owner of the agent, unlike Yemelos, had less than a 50% interest in the partnership. *Raphan* is also distinguishable. In that case, although the owner of the agent had a 50% stake in the partnership, the trial court found that there was a sharing of control in the partnership such that no partner had a controlling interest. By contrast, Yemelos always held a majority interest in the partnership. Moreover, there was no showing that Yemelos was unable to control Argo because he only had a 50% stake in the company. Accordingly, we hold that the disparity of ownership interests in Argo and the partnership does not distinguish this case from *Ourisman* and *Roccaforte*.

The Tax Court also noted that Yemelos initially agreed to use Conduit as the nominee corporation. Yemelos turned to Argo

---

2. The Tax Court in *Ourisman* held that the corporation was a nontaxable agent. *Ourisman v. Commissioner*, 82 T.C. 171 (1984), *rev'd*, 760 F.2d 541 (4th Cir.1985). *Ourisman* was pending on appeal when this case was decided.

only after the lender objected to the use of Conduit. None of the investors in the partnership owned stock in Conduit. The taxpayers contend that Yemelos's willingness to use a nominee over which the partnership had no control establishes that the relationship between the partnership and Argo was conducted at arm's length.

Conduit would have charged the partnership a $1,000 fee, but the agreement with Argo did not require the payment of compensation. *Ourisman* holds that one of the factors to be considered in determining whether an arm's length relationship exists is whether "the agent has entered into a written agency contract . . . providing for a reasonable fee for the agent's services." 760 F.2d at 548. It is inconceivable that Argo would freely agree to perform services without any promise of compensation. Argo was paid $100 in March 1980, but the partnership was not required to make this payment, and it came almost three years after Argo conveyed the hotel to the partnership. *Cf. Jones v. Commissioner,* 640 F.2d 745, 753–54 (5th Cir.1981) (fifth *National Carbide* factor is not satisfied when the amount and timing of compensation is speculative). Therefore, we hold that Yemelos's attempt to utilize Conduit does not establish that the partnership entered into an arm's length agreement with Argo. We also reject the taxpayers' argument that Yemelos's fiduciary obligations as a director of Argo ensured that Argo's relationship with the partnership was conducted at arm's length. The facts simply do not support this theory.

The taxpayers argue that the use of Argo to circumvent Mississippi's usury laws was "a meaningless exercise that

should be devoid of tax consequences." They note that the partnership retained equitable title to the property and was responsible for deciding how to operate the hotel project. Therefore, the taxpayers contend, "[t]he doctrine of substance over form demands recognition of the partnership as principal of its corporate nominee."

We cannot accept the taxpayers' argument. The substance of this transaction matches its form because, as the Commissioner emphasizes, Argo's ability to borrow money was premised on its status as a principal rather than as the agent of a noncorporate borrower. The loan papers do not disclose that Argo was acting for any one other than itself.[3]

The evidence establishes that Argo's relationship with the partnership was dependent on Yemelos's 50% ownership of Argo, his majority interest in the partnership, and his position as a general partner. Yemelos created the relationship. Acting for the partnership, he conveyed the hotel site to Argo, defined Argo's function, and guaranteed its debts. In 1977, he terminated the relationship by causing Argo to transfer improved real estate to the partnership for nominal consideration. Applying the test prescribed by *National Carbide* to these undisputed facts, we reverse the Tax Court's judgment. *See National Carbide,* 336 U.S. at 437, 69 S.Ct. at 734; *Ourisman,* 760 F.2d at 547–48.

## IV

■■■ The taxpayers appeal the Tax Court's judgment allocating 11% of the project's losses to Coastal Golf. The taxpayers did not present evidence during the trial concerning the proper allocation of

3. The taxpayers assert that Rev.Rul. 31, 1975–1 C.B. 10, and Rev.Rul. 26, 1976–1 C.B. 10, authorized "the use of a nominee corporation owned by the general partner to secure loans [to] its principal partnership as a device to avoid the requirements of New York law." We disagree. These corporations were created, not to avoid the requirements of New York law, but rather to comply with New York law in order to obtain funding from state agencies for public housing projects. In return for this funding, the state agencies were authorized to assume control of

the corporations from the partnerships if the partnerships failed to develop the housing projects in accordance with state law. Thus, the activities of the corporations were largely regulated by the state. The Service ruled that the relationship between the partnerships and the corporations was not dependent on the partnerships' control of the corporations in light of the state's ability to assume control of the corporations. These rulings are not applicable to the present case because no entity is authorized to divest the partnership of its control of Argo.

operating losses between Coastal Golf and Argo. Therefore, the court apportioned these losses on the basis of the only available evidence, which was the golf course's share of the project's capital costs. The court subsequently denied the taxpayers' motion to reopen the case for the presentation of evidence concerning the allocation of operating losses.

The taxpayers contend that the golf course's share of the project's operating losses was less than its 11% share of the project's capital costs. They assert that the court's decision is clearly erroneous and that the court abused its discretion in denying their motion to present additional evidence. The taxpayers rely on *Stivers v. Commissioner*, 360 F.2d 35 (6th Cir.1966), in which the Tax Court was required to receive additional evidence because the taxpayers were justified in their erroneous belief that failure to introduce the evidence would not affect the Tax Court's decision.

The taxpayers' reliance on *Stivers* is misplaced because it was foreseeable that the court would treat Coastal Golf and Argo differently in light of Yemelos's different reasons for using the two corporations. Therefore, the taxpayers were not justified in failing to present evidence concerning the proper allocation of losses between the two corporations.

The Tax Court did not err in allocating 11% of the project's operating losses to Coastal Golf. The taxpayers bore the burden of establishing the proper allocation. *See Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9–10, 78 L.Ed. 212 (1933). However, they did not offer any evidence during the trial. In these circumstances, the court was entitled to make a reasonable approximation on the basis of the evidence available to it. *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir.1930). Furthermore, the court did not abuse its discretion in refusing to reopen the case to hear additional evidence because the "inexactitude [was] of [the taxpayers'] own making." *Cohan*, 39 F.2d at 544.

### V

The Tax Court's judgment allocating 11% of the project's losses to Coastal Golf is affirmed. The Court's judgment that the taxpayers can deduct part of Argo's losses is reversed, and the case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.