803 F.2d 144
 58 A.F.T.R.2d 86-6046, 86-2 USTC P 9752
 James M. GEORGE and Margaret C. George, Hollis O. Graham and
Ida G. Graham, George A. Wolcott and Dorothy Wolcott, Tuncay
Ertan and Nona G. Ertan, Estate of Coman S. Norton,
Deceased, Caroline Norton, Testamentary Executrix, Roland M.
Toups and Kathryn B. Toups, David R. Carpenter and Erica J.
Carpenter, Charles A. Prince and Ruth O. Prince, Harry R.
Layne and Janet J. Layne, Stephen G. Abshire and Mary B.
Abshire, Janet F. Baum, Formerly Janet F. Norton, Kenneth G.
Fink, Jr. and Carol Fink, Donald L. McCollister and Sandra
M. McCollister, Robert A. Rayford and Iris B. Rayford, Frem
F. Boustany, Sr. and Beatrice J. Boustany, Frem F. Boustany,
Jr. and Angell F. Boustany, Sidney Frederick and Irene S.
Frederick, Roland M. Toups and Kathryn B. Toups,
Petitioners-Appellees-Cross-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant-Cross-Appellee.
 No. 85-4786.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 24, 1986.
 
 Teresa E. McLaughlin, Glenn L. Archer, Jr., Asst. Atty. Gen., U.S. Dept. of Justice, Roger M. Olsen, Michael L. Paup, Chief, Appellate Section, Ann Belanger Durney, Washington, D.C., for respondent-appellant-cross-appellee.
 F. Kelleher Riess, J. Gregory Wyrick, Metairie, La., for petitioners-appellees-cross-appellants.
 Appeals from the Decisions of the United States Tax Court.
 Before THORNBERRY, JOHNSON, and WILLIAMS, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 Taxpayers were limited partners in the Biloxi Hotel Properties Partnership ("BHPP") and claimed their distributive share of losses from the development of the Biloxi Hilton Hotel. That project included both a hotel and a golf course. The Commissioner disallowed those losses because two corporations, Argo Hotels, Inc. ("Argo") and Coastal Golf, Inc. ("CG"), owned the project during the pertinent period. The Tax Court disagreed with the Commissioner in part: it found that Argo acted as agent for BHPP with respect to the hotel, but that neither Argo nor CG acted as an agent with respect to the golf course. The Tax Court proceeded to allocate 11 percent of the total losses to the golf course. The Commissioner appeals the Tax Court's decision that Argo acted solely as agent for BHPP. The taxpayers cross-appeal the Tax Court's allocation of the loss. We reverse the Tax Court's decision on the question whether Argo acted as an agent. We dismiss the cross-appeals as moot.
 
 Facts
 
 2
 The Tax Court opinion thoroughly describes the transactions at issue. Frink v. Commissioner, 49 T.C.M. (CCH) 386 (1984).[1] We summarize the pertinent facts here. John C. Yemelos formed a partnership named Casren to develop the Biloxi Hilton Hotel. Yemelos owned 80 percent of the partnership and his mother-in-law, Phopho Cosmas, owned the remaining 20 percent. To build the hotel, Yemelos wished to borrow $6.7 million from Mortgage Investors of Washington ("MIW"). Had MIW loaned that money directly to the partnership Casren, the interest rate would have been usurious under Mississippi law. To circumvent the Mississippi usury law, Yemelos and MIW structured the transaction through a corporation. MIW's counsel originally suggested a corporation that he owned named Conduit. Conduit would have charged a fee of $1000. MIW rejected that proposal. The parties then agreed to use a corporation named Argo, of which Yemelos and his wife each owned 50 percent. To that end Yemelos conveyed the land for the hotel to Argo. Yemelos and Argo agreed that:
 
 
 3
 (1) Argo would act as Yemelos' agent in securing the MIW loan on his behalf; (2) Yemelos would indemnify Argo against all claims arising under the agreement; (3) Yemelos would fund all disbursements incident to the loan; (4) Yemelos would personally guarantee the loan; and (5) Argo would 'transact no business whatsoever for its own account as long as record title to this property and construction project remain in its name.'
 
 
 4
 Frink, 49 T.C.M. at 390. In 1973 Argo borrowed the $6.7 million from MIW. In return, Argo executed notes and deeds of trust in favor of MIW. Yemelos and his wife personally guaranteed the entire $6.7 million loan to Argo.
 
 
 5
 All of those instruments described Argo as the owner of the hotel site. Yemelos and his wife submitted affidavits that Argo was the owner of the hotel site. "It was [MIW's counsel's] understanding, however, that the term 'owner,' as used in this context, related to legal ownership and not to equitable or beneficial ownership of the property." Id. at 391. In addition, "it was similarly the understanding of ... the president of MIW ... that Yemelos was the real borrower with whom MIW was dealing, and that the construction loan was being made to a 'nominee' corporate entity solely because of Mississippi usury laws." Id.
 
 
 6
 In 1975 Yemelos formed CG to purchase a golf course in connection with the hotel project. Yemelos and his wife were the sole shareholders of CG. CG purchased the Edgewater Golf Course from Bankers Trust Savings and Loan Association ("Bankers Trust"). Yemelos used CG not to circumvent Mississippi usury laws but to limit his personal liability. In accordance with his desire to limit his personal liability on the golf course note, Yemelos personally guaranteed repayment of only $100,000.
 
 
 7
 In 1975 Yemelos also converted Casren into BHPP, a partnership in commendam (a limited partnership under Louisiana law). Yemelos and Cosmas were general partners, and they initially owned 68.9 percent and 5.3 percent interests respectively. Subsequent additions to the partnership reduced Yemelos's interest to 53.94 percent. BHPP executed "nominee agreements" with both Argo and CG, which provided that those corporations held only record title to the hotel and golf course and that BHPP was the legal, equitable and beneficial owner. Neither agreement was publicly recorded.
 
 The Tax Court found:
 
 8
 At all times here pertinent, Argo was a viable and active corporation which performed business activities including holding title to real estate, executing mortgages and deeds of trust, negotiating loans, entering into contracts, including a nominee agreement with BHPP, acquiring personal property, subjecting itself to third-party claims during construction, receiving income, incurring expenses, and filing Federal and state income tax returns.
 
 
 9
 Id. at 394. In 1976 CG transferred the golf course to Argo. In 1977, Argo conveyed the hotel site and the golf course to BHPP. Three years later, in 1980, Argo received $100 in return for its services as agent.
 
 
 10
 BHPP reported losses totalling over $4 million from the construction and operation of the Biloxi Hilton Hotel project on its returns for 1975 through 1977. As limited partners in BHPP, appellees deducted their distributive share of those losses on their individual returns. The Commissioner disallowed those deductions after determining that the losses were properly attributable to Argo and not to BHPP. The Tax Court disagreed with the Commissioner in part and found as a matter of fact that "Argo served solely as the corporate agent of Casren and/or BHPP with respect to the development of the hotel site." Id. It agreed with the Commissioner that "CG and Argo acted in their own name and for their own account, and not as corporate agents, with respect to their ownership and operation of the golf course." Id.
 
 Appeal
 
 11
 The Commissioner appeals the Tax Court's ultimate finding that "Argo served solely as the corporate agent of Casren and/or BHPP with respect to the development of the hotel site." Id. Because we agree with the Commissioner that the Tax Court's finding is clearly erroneous, we reverse the Tax Court's decision on that point.[2] The fourth circuit reached the same conclusion. Frink v. Commissioner, 798 F.2d 106, 109-10 (4th Cir.1986).
 
 
 12
 The Commissioner argues forcefully that the Tax Court misapplied the "fifth factor" of the agency test set forth in National Carbide Corporation v. Commissioner, 336 U.S. 422, 437, 69 S.Ct. 726, 734, 93 L.Ed. 779 (1949): "If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case."[3] Although not entirely satisfied that the Tax Court correctly applied the National Carbide test in other respects,[4] we confine our decision to whether the Tax Court erred in determining that Argo's relationship with BHPP did not depend on Yemelos's ownership of Argo. In other words, we accept for the purposes of this opinion that Argo acted as agent for BHPP and not in its own name in developing the hotel site. This opinion addresses the question whether that agency relationship depended on Yemelos's ownership of BHPP and Argo.
 
 
 13
 Initially, we reaffirm our conclusion in Roccaforte v. Commissioner that the independence requirement is mandatory. 708 F.2d 986, 989-90 (5th Cir.1983). The Supreme Court's language in National Carbide allows no other result. Accord Frink, 798 F.2d at 109; Ourisman v. Commissioner, 760 F.2d 541, 547-48 (4th Cir.1985). When the relationship between a putative agent and its principal depends on the principal's ownership of the agent, the tax law will not accept the putative agency relationship.
 
 
 14
 Taxpayers may satisfy the independence requirement by showing either that the principal did not own the agent or that the agency relationship did not depend on such ownership. Taxpayers argue in their brief that "not only were the limited partners not owners of Argo, but Argo was only fifty (50%) percent owned by one of two general partners." The Tax Court agreed that the divergence in ownership between BHPP and Argo satisfies the independence requirement. See Frink 49 T.C.M. at 398. We disagree. "[C]ommon control may legally exist in either of two ways[:] the principal can own a controlling interest in the agent or the same parties may own or control both principal and agent...." Raphan v. United States, 759 F.2d 879, 883 (Fed.Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). We conclude that Yemelos controlled both BHPP and Argo. At all times Yemelos owned a majority interest in BHPP. In addition, he owned 50 percent of Argo and his wife owned the other 50 percent. The facts indicate that Yemelos controlled Argo, and the taxpayers do not dispute that. For example, Argo performed without promise of compensation substantial services for which Conduit would have charged $1000.
 
 
 15
 In Raphan, the court upheld the Claims Court's finding that a corporation wholly owned by one of two equal partners was the agent for the partnership. Id. at 883-84. There, however, the court rejected the government's assertion that one of the two equal partners totally dominated the other, finding instead that the two partners intended to share control. The Tax Court made no such finding in this case. Indeed, such a finding is implausible. The taxpayers also cite Moncrief v. Commissioner, 730 F.2d 276 (5th Cir.1984). In that case the sole owner of the corporate agent had only a 25 percent interest in the principal. In this case, however, Yemelos owned a majority interest in the principal and shared control of the agent with his wife. On these facts, we hold that the taxpayers must prove that the relationship between Argo and BHPP did not depend on their common ownership.[5]
 
 
 16
 " '[T]he significant criteria, as we understand them, are whether the so-called "agent" would have made the agreement if the so-called "principals" were not its owners, and conversely whether the "principals" would have undertaken the arrangement if the "agent" were not their corporate creature.' " Roccaforte, 708 F.2d at 990 (quoting Harrison Property Management Co. v. United States, 475 F.2d 623, 627 (Ct.Cl.1973), cert. denied, 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974)). In other words, taxpayers must prove that Yemelos and BHPP dealt with Argo at arm's length. See Ourisman, 760 F.2d at 548.
 
 
 17
 Yemelos made no provision for compensating Argo in the nominee agreements. Yemelos paid Argo no compensation during the period that Argo actually held title to the assets. Argo finally received $100 in 1980, three years after it had transferred all of the assets to BHPP. "It is inconceivable that Argo would freely agree to perform services without any promise of compensation." Frink, 798 F.2d at 110; see also Roccaforte, 708 F.2d at 990 n. 4; Jones v. Commissioner, 640 F.2d 745, 753-54 (5th Cir.), cert. denied, 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981); Roccaforte v. Commissioner, 77 T.C. 263, 287 (1981), rev'd, 708 F.2d 986 (5th Cir.1983). Moreover, Argo acted as an agent for no one other than Yemelos and BHPP. See Roccaforte, 708 F.2d at 990 n. 4; Ourisman, 760 F.2d at 548.
 
 
 18
 Taxpayers argue that Yemelos's willingness to use Conduit, a corporation in which he owned no stock, demonstrates the independence of Argo's relationship with BHPP. MIW rejected that arrangement "at least in part because it did not approve of the word 'conduit' in the corporate name."[6] Frink, 49 T.C.M. at 390. Yemelos may have been willing to use an unrelated corporate agent, but he did not do so. That Conduit would have charged $1000 for the same services that Argo performed without any promise of compensation buttresses our conclusion that Yemelos did not deal at arm's length with Argo.
 
 
 19
 Taxpayers also argue that Argo's relationship with BHPP had to be independent of Yemelos's ownership because Yemelos as general partner owed the limited partners in BHPP a fiduciary duty. Any fiduciary obligation in favor of the limited partners would limit the compensation that Yemelos could pay Argo in return for agency services. Here, BHPP paid Argo too little, not too much. We therefore reject taxpayers' argument that Yemelos's fiduciary duty demonstrates that he bargained at arm's length with Argo for agency services.[7]
 
 Conclusion
 
 20
 The Tax Court found that "the relationship of Argo ... to Casren and BHPP was not dependent upon the ownership and control of the former ... by the latter two entities." Frink, 49 T.C.M. at 398. That finding is clearly erroneous. Accordingly, we reverse the Tax Court's decision to the extent that it treats Argo as the agent for BHPP. The Tax Court allocated the loss between the hotel and the golf course only after it determined that Argo acted as an agent for the hotel, but that neither Argo nor CG acted as an agent for the golf course. Because we hold that neither Argo nor CG satisfies the agency test of National Carbide for the hotel or the golf course, we need not consider the Tax Court's allocation of loss between the hotel and the golf course--BHPP can deduct losses for neither.[8] Accordingly, we dismiss the cross-appeals as moot. We remand the case for further proceedings consistent with this opinion.
 
 
 21
 REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 The Tax Court decision covered twenty consolidated docket numbers. Taxpayers in 18 of those 20 docket numbers properly appealed to this court. Taxpayers in the remaining two docket numbers appealed to the United States Court of Appeals for the Fourth Circuit. Frink v. Commissioner, 798 F.2d 106 (4th Cir.1986)
 
 
 [2]
 The Tax Court's finding on Argo's agency status is one of fact. See Moncrief v. United States, 730 F.2d 276, 282-83 (5th Cir.1984); Raphan v. United States, 759 F.2d 879, 883 (Fed.Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). We must affirm that finding unless it is clearly erroneous. See 26 U.S.C. Sec. 7482; Fed.R.Civ.P. 52(a). The fourth circuit in Frink does not mention the standard of review: "Applying the test prescribed by National Carbide to these undisputed facts, we reverse the Tax Court's judgment." Frink, 798 F.2d at 110. In Ourisman v. Commissioner, the fourth circuit phrased its holding as follows: "The [Tax] [C]ourt made explicit factual findings that we conclude, as a matter of law, preclude an agency finding under the proscription in the fifth factor." 760 F.2d 541, 548 (4th Cir.1985). We hold simply that the Tax Court's finding is clearly erroneous
 
 
 [3]
 The entire test reads as follows:
 What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent.
 National Carbide, 336 U.S. at 437, 69 S.Ct. at 734.
 
 
 [4]
 Of particular concern is the Tax Court's distinction between Argo and CG. BHPP executed the same nominee agreement with both corporations, and both corporations performed essentially the same services. In addition, "[a]s with Argo, neither the note nor Yemelos's partial guarantee described CG as an agent." Frink, 49 T.C.M. at 397. The Tax Court treated CG differently than Argo for two reasons. First, Yemelos's purpose in using CG was to limit his personal liability as opposed to circumventing the Mississippi usury laws. The objective relationship between BHPP and Argo or CG, not Yemelos's purpose in using the corporate form, should determine whether the corporation acted as an agent. Moreover, the Tax Court's analysis suggests that Yemelos was only liable on those notes through his personal guaranties. In that case, neither corporation actually bound anyone but itself on those notes, and both MIW and Bankers Trust were in the same position with respect to the property and the corporate borrower--MIW simply had an additional guaranty. If Argo was Yemelos and BHPP's agent, then it should have been able to bind them as primary obligors and the guaranties would have been superfluous. Second, the Tax Court reasoned that there was no evidence (like the testimony of MIW's counsel and president) that Bankers Trust regarded CG as merely a title holder for Yemelos. The Tax Court's reliance on MIW's subjective understanding of the transaction seems misplaced given that MIW required Yemelos and his wife to submit affidavits stating that Argo owned the hotel site
 Our concern with the Tax Court's finding that Argo acted as BHPP's agent is "bottomed upon [our] inability ... to accept the proposition that [Argo] was not the substantive law owner of the assets." Miller, The Nominee Conundrum: The Live Dummy Is Dead, but the Dead Dummy Should Live, 34 Tax L.Rev. 213, 254 (1979).
 It seems quite clear that any doubts should be resolved against taxpayers who have failed to make crystal clear the nature of the corporation's ownership. Moreover, the court would be fully justified in refusing to act upon the basis of documents kept hidden in files until produced for the purpose of resisting the tax collector.
 Id. at 267 n. 134 (citation omitted).
 
 
 [5]
 Even before Roccaforte, commentators recognized that it was safer to use an unrelated corporate agent. See, e.g., B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders p 2-10 at 2-29 (4th ed. 1979) ("These uncertainties, coupled with the hostile attitude of courts in recent years to claims that a corporation is the agent or nominee of its shareholders, suggest that cautious taxpayers may be well advised to use unrelated third-party entities for nominee functions.")
 
 
 [6]
 MIW's aversion to the name Conduit may indicate that it wanted Argo and not Yemelos, Casren, or BHPP to be the actual owner of the land. That MIW required affidavits from Yemelos and his wife stating that Argo was the "owner" as opposed to the holder of mere legal title supports that view. Those observations, however, relate to the finding of an agency relationship in the first place and not to the independence of that relationship
 
 
 [7]
 We distinguish Rev.Rul. 75-31, 1975-1 C.B. 10, and Rev.Rul. 76-26, 1976-1 C.B. 10, for the reasons stated in Frink, 798 F.2d at 110 n. 3
 
 
 [8]
 The taxpayers argue in their brief that they presented no evidence on the proper allocation of the total loss because they "were wholly unaware that the Court would arrive at different conclusions regarding Argo and Coastal Golf."