844 F.2d 225
 61 A.F.T.R.2d 88-1151, 88-1 USTC P 9329
 James M. GEORGE and Margaret C. George, Hollis O. Graham and
Ida G. Graham, George A. Wolcott, and Dorothy Wolcott,
Tuncay Ertan and Nona G. Ertan, Estate of Coman S. Norton,
Deceased, Caroline Norton, Testamentary Executrix, Roland M.
Toups and Kathryn B. Toups, David R. Carpenter, and Erica J.
Carpenter, Charles A. Prince and Ruth O. Prince, Harry R.
Layne and Janet J. Layne, Stephen G. Abshire and Mary B.
Abshire, Janet F. Baum, Formerly Janet F. Norton, Kenneth G.
Fink, Jr. and Carol Fink, Donald L. McCollister and Sandra
M. McCollister, Robert A. Rayford and Iris B. Rayford, Frem
F. Boustany, Sr. and Beatrice J. Boustany, Frem F. Boustany,
Jr. and Angell F. Boustany, Sidney Frederick and Irene S.
Frederick, Roland M. Toups and Kathryn B. Toups,
Petitioners-Appellees-Cross-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant-Cross-Appellee.
 No. 85-4786.
 United States Court of Appeals,
Fifth Circuit.
 May 6, 1988.
 
 Teresa E. McLaughlin, Atty., Glenn L. Archer, Jr., Asst. Atty. Gen., U.S. Dept. of Justice, Roger M. Olsen, Atty., Michael L. Paup, Chief Appellate Section, Ann Belanger Durney, Atty., Fred T. Goldberg, Jr., Chief Counsel, IRS, Washington, D.C., for respondent-appellant-cross-appellee.
 F. Kelleher Riess, J. Gregory Wyrick, Metairie, La., for petitioners-appellees-cross-appellants.
 Appeals from the Decisions of the United States Tax Court.
 Before THORNBERRY, JOHNSON, and WILLIAMS, Circuit Judges.
 ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES
 THORNBERRY, Circuit Judge:
 
 
 1
 Taxpayers were limited partners in the Biloxi Hotel Properties Partnership ("BHPP") and claimed their distributive share of losses from the development of the Biloxi Hilton Hotel. That project included both a hotel and a golf course. The Commissioner disallowed those losses because two corporations, Argo Hotels, Inc. ("Argo") and Coastal Golf, Inc. ("CG"), owned the project during the pertinent period. The Tax Court disagreed with the Commissioner in part. The Court found that Argo had acted as an agent for BHPP with respect to the hotel, thus allowing the tax consequences to flow to BHPP. The Court also found, however, that neither Argo nor CG acted as an agent with respect to the golf course. The Court then allocated 11 percent of the total losses to the golf course.
 
 
 2
 The Commissioner appealed the Tax Court's decision that Argo acted as an agent for BHPP. The taxpayers cross-appealed the Tax Court's allocation of the losses. This court reversed the Tax Court on the agency question and dismissed the cross appeal as moot. George v. Commissioner, 803 F.2d 144 (5th Cir.1986). On petition for certiorari, however, the Supreme Court vacated our judgment and remanded the case to us for further consideration in light of its recent decision in Commissioner v. Bollinger, 485 U.S. ----, 108 S.Ct. 1173, 99 L.Ed.2d 357 (1988). George, --- U.S. ----, 108 S.Ct. 1264, 99 L.Ed.2d 476 (1988).
 
 
 3
 Our review of Bollinger indicates that we must now affirm the Tax Court's agency determination. This disposition requires us to address the taxpayers' cross appeal on the allocation of losses. We also affirm the Tax Court on this issue.
 
 I. Facts
 
 4
 The Tax Court opinion thoroughly describes the transactions at issue. Frink v. Commissioner, 49 T.C.M. (CCH) 386 (1984).[1] We summarize the pertinent facts here. John C. Yemelos formed a partnership named Casren to develop the Biloxi Hilton Hotel. Yemelos owned 80 percent of the partnership and his mother-in-law, Phopho Cosmas, owned the remaining 20 percent. To build the hotel, Yemelos wished to borrow $6.7 million from Mortgage Investors of Washington ("MIW"). Had MIW loaned that money directly to the partnership Casren, the interest rate would have been usurious under Mississippi law. To circumvent the Mississippi usury law, Yemelos and MIW structured the transaction through a corporation. MIW's counsel originally suggested a corporation that he owned named Conduit. Conduit would have charged a fee of $1000. MIW rejected that proposal. The parties then agreed to use a corporation named Argo, of which Yemelos and his wife each owned 50 percent. To that end, Yemelos conveyed the land for the hotel to Argo. Yemelos and Argo agreed that:
 
 
 5
 (1) Argo would act as Yemelos' agent in securing the MIW loan on his behalf; (2) Yemelos would indemnify Argo against all claims arising under the agreement; (3) Yemelos would fund all disbursements incident to the loan; (4) Yemelos would personally guarantee the loan; and (5) Argo would 'transact no business whatsoever for its own account as long as record title to this property and construction project remain in its name.'
 
 
 6
 Frink, 49 T.C.M. at 390. In 1973 Argo borrowed the $6.7 million from MIW. In return, Argo executed notes and deeds of trust in favor of MIW. Yemelos and his wife personally guaranteed the entire $6.7 million loan to Argo.
 
 
 7
 All of those instruments described Argo as the owner of the hotel site. Yemelos and his wife submitted affidavits that Argo was the owner of the hotel site. "It was [MIW's counsel's] understanding, however, that the term 'owner,' as used in this context, related to legal ownership and not to equitable or beneficial ownership of the property." Id. at 391. In addition, "it was similarly the understanding of ... the president of MIW ... that Yemelos was the real borrower with whom MIW was dealing, and that the construction loan was being made to a 'nominee' corporate entity solely because of Mississippi usury laws." Id.
 
 
 8
 In 1975 Yemelos formed CG to purchase a golf course in connection with the hotel project. Yemelos and his wife were the sole shareholders of CG. CG purchased the Edgewater Golf Course from Bankers Trust Savings and Loan Association ("Bankers Trust"). Yemelos used CG not to circumvent Mississippi usury laws but to limit his personal liability. In accordance with his desire to limit his personal liability on the golf course note, Yemelos personally guaranteed repayment of only $100,000.
 
 
 9
 In 1975 Yemelos also converted Casren into BHPP, a partnership in commendam (a limited partnership under Louisiana law). Yemelos and Cosmas were general partners, and they initially owned 68.9 percent and 5.3 percent interests respectively. Subsequent additions to the partnership reduced Yemelos' interest to 53.94 percent. BHPP executed "nominee agreements" with both Argo and CG, which provided that those corporations held only record title to the hotel and golf course and that BHPP was the legal, equitable and beneficial owner. Neither agreement was publicly recorded.
 
 The Tax Court found:
 
 10
 At all times here pertinent, Argo was a viable and active corporation which performed business activities including holding title to real estate, executing mortgages and deeds of trust, negotiating loans, entering into contracts, including a nominee agreement with BHPP, acquiring personal property, subjecting itself to third-party claims during construction, receiving income, incurring expenses, and filing Federal and state income tax returns.
 
 
 11
 Id. at 394. In 1976 CG transferred the golf course to Argo. In 1977, Argo conveyed the hotel site and the golf course to BHPP. Three years later, in 1980, Argo received $100 in return for its services as agent.
 
 
 12
 BHPP reported losses totalling over $4 million from the construction and operation of the Biloxi Hilton Hotel project on its returns for 1975 and 1977. As limited partners in BHPP, appellees deducted their distributive share of those losses on their individual returns. The Commissioner disallowed those deductions after determining that the losses were properly attributable to Argo and not to BHPP. The Tax Court disagreed with the Commissioner in part and found that "Argo served solely as the corporate agent of Casren and/or BHPP with respect to the development of the hotel site." Id. It agreed with the Commissioner that "CG and Argo acted in their own name and for their own account, and not as corporate agents, with respect to their ownership and operation of the golf course." Id.
 
 II. Agency
 
 13
 The Commissioner appeals the Tax Court's ultimate finding that "Argo served solely as the corporate agent of Casren and/or BHPP with respect to the development of the hotel site." The Supreme Court set forth the test for determining whether a corporation is a true agent of its owner-principal in National Carbide Corp. v. Commissioner, 336 U.S. 422, 437, 69 S.Ct. 726, 734, 93 L.Ed. 779 (1949). The National Carbide test contains six factors:
 
 
 14
 Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent.
 
 
 15
 Id. (footnotes omitted).
 
 
 16
 The Tax Court examined each of these six factors in concluding that Argo was an agent of the partnership. The Commissioner appeals the Tax Court's conclusion, arguing that the Court misapplied the fifth factor of the agency test. The Commissioner argues that a controlled corporation may be considered an agent of its shareholders only where the taxpayers can establish that the controlled corporation is acting at "arm's length" with its shareholders. The Commissioner asserts that the fifth factor is "the critical element for distinguishing between a controlled corporation acting as such and a controlled corporation acting as a true agent, and, consequently, is an indispensable prerequisite for recognition of agency status for tax purposes."
 
 
 17
 The Commissioner's position was very plausible given this court's discussions of the fifth factor in Roccaforte v. Commissioner, 708 F.2d 986 (5th Cir.1983). In that case we stated that the fifth factor was "mandatory and absolute." Id. at 989; accord Ourisman v. Commissioner, 760 F.2d 541, 547-48 (4th Cir.1985). The Supreme Court's recent decision in Commissioner v. Bollinger, 485 U.S. ----, 108 S.Ct. 1173, 99 L.Ed.2d 357 (1988), however, clarified the status of what the Court called the "not entirely clear" fifth factor. The Court rejected the Commissioner's argument that the fifth factor was a rigid requirement that required an arm's length relationship between the corporate agent and its shareholder principal. As the Court noted, "[u]ltimately, the relations between a corporate agent and its owner-principal are always dependent upon the fact of ownership, in that the owner can cause the relations to be altered or terminated at any time." Id. at ----, 108 S.Ct. at 1179. (emphasis in original). Thus, the Court found that the fifth factor, rather than a rigid requirement, was nothing more than a generalized statement of concern that the separate entity doctrine not be subverted. Id. at ----, 108 S.Ct. at 1179; see generally Moline Properties v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943) (holding that a corporation may be a separate taxable entity even if it has only one shareholder who exercises total control over its affairs).
 
 
 18
 The Court then set forth a three-part test to be used in determining whether a controlled corporation is a true agent. The corporation will be treated as an agent
 
 
 19
 when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is set forth in a written agreement at the time the asset is acquired, the corporation functions as agent and not principal with respect to the asset for all purposes, and the corporation is held out as the agent and not principal in all dealings with third parties relating to the asset.
 
 
 20
 Bollinger, 485 U.S. at ----, 108 S.Ct. at 1179.
 
 
 21
 The Tax Court made detailed findings of fact. The Court found that on October 5, 1973 Yemelos and Argo entered into a trust agreement that provided that Argo would "transact no business whatsoever for its own account as long as record title to this property and construction project remain in its name" (emphasis added). Yemelos transferred the property to Argo on October 10, 1973. A nominee agreement with BHPP clearly disclosed that Argo was an agent with respect to the property. These findings are not clearly erroneous. Thus, we find the first factor in the Bollinger test is satisfied.
 
 
 22
 The Tax Court also found that funds relating to the project were not controlled by Argo; in fact, even the few checks that were made payable to Argo were deposited in the partnership's bank account. The management services for the hotel were performed not by Argo but by Omicron Corporation, which was wholly owned by Yemelos. The partners "believed themselves to be and generally acted as the owners of the hotel." Although Argo did enter into two building contracts relating to the hotel, Yemelos, who represented the partnership, owned one-half of the building contractor corporations. Yemelos, of course, had actual knowledge of Argo's agency status. These findings, which are adequately supported by the record, satisfy the second Bollinger requirement.
 
 
 23
 Finally, the Court found that all of the primary project creditors were aware of Argo's agency status.
 
 
 24
 Therefore, we hold that the agency test set forth in Bollinger is met in this case. When agency is clear, there is no risk that taxpayers could, at the end of the year, manipulate the corporation's status to minimize their tax liability. See Bollinger, 485 U.S. at ----, 108 S.Ct. at 1177. Consequently, when it is clear that the parties intended that the corporation act only as an agent, there is no need to make a separate strict inquiry about the extent to which the agent corporation's status is dependent on the principal's ownership. Therefore, we hold that the Tax Court did not commit reversible error in its application of National Carbide 's fifth factor.
 
 III. Loss Allocation
 
 25
 Having determined that Argo was a true agent of the partnership and that CG was not, the Tax Court had to disallow a deduction to the partnership for the percentage of the total losses attributable to CG. Neither the Commissioner nor the taxpayers, however, had introduced any evidence on the proper amount of income to allocate to each corporation. Thus, the Court allocated the income based on the only evidence it had--the relative costs of acquisition and construction of the hotel and the golf course. Because the golf course's cost was approximately eleven percent of the total cost of the hotel and the golf course together, the Court concluded that the taxpayers could not deduct eleven percent of their total claimed losses.
 
 
 26
 Subsequently, the Tax Court granted leave to the taxpayers to file an out-of-time motion for reconsideration of findings of fact and opinion pursuant to Rule 160 of the Rules of Practice and Procedure of the United States Tax Court. The taxpayers admitted that they had produced no evidence on the allocation issue. Nevertheless, they argued that the Court's method of allocation was clearly erroneous and that the Court should reconsider the allocation method or instruct the parties to stipulate to an appropriate allocation. The Court denied the taxpayers' motion for reconsideration.
 
 
 27
 The Tax Court's refusal to reopen the case will not be disturbed absent an abuse of discretion. Estate of Frieders v. Commissioner, 687 F.2d 224, 228 (7th Cir.1982); Rodman v. Commissioner, 542 F.2d 845, 860 (2d Cir.1976). Although the Tax Court was forced to make its allocation on a sketchy record, it was the taxpayers who had the burden of improving that record. See Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); Cinelli v. Commissioner, 502 F.2d 695, 699 (6th Cir.1974). That an allocation of income between the two corporations might be necessary certainly should have been foreseeable to the taxpayers, and we can see no excuse for the taxpayers' failure to produce their evidence earlier. See Estate of Frieders, 687 F.2d at 228; cf. Stivers v. Commissioner, 360 F.2d 35, 40-41 (6th Cir.1966) (reversing the Tax Court's refusal to reopen the case for new evidence when the taxpayers could not have known that a fact was disputed until the announcement of the Court's opinion). Thus, we hold that the Tax Court was well within its discretion to refuse to consider the taxpayers' evidence. Accordingly, we find no error in the Court's denial of the Rule 160 motion.
 
 IV. Conclusion
 
 28
 For the reasons set forth in this opinion, we AFFIRM the decision of the Tax Court.
 
 
 
 [1]
 The Tax Court decision covered twenty consolidated docket numbers. Taxpayers in 18 of those 20 docket numbers properly appealed to this court. Taxpayers in the remaining two docket numbers appealed to the United States Court of Appeals for the Fourth Circuit. Frink v. Commissioner, 798 F.2d 106 (4th Cir.1986)